BERNICE MATLOW, Plaintiff-Appellee, v. VICKI ROSENFELD, Defendant-Appellant.

Fifth District   No. 5—91—0716

Opinion filed May 21, 1993.

Eric L. Terlizzi, of Pfaff, Garner & Terlizzi, of Salem, for appellant.

Curtis L. Blood, of Collinsville, for appellee.

JUSTICE GOLDENHERSH delivered the opinion of the court:

Plaintiff, Bernice Matlow, is the operator of a certain oil lease in Marion County known as the "Kagy lease." Plaintiff owns 65% of the working interest in the Kagy lease. Defendant, Vicki Rosenfeld, owns a 5% working interest in the lease, which she acquired in a negotiated settlement of the estate of her father. Plaintiff and defendant are mother and daughter, and both are California residents. Plaintiff filed suit against defendant seeking to recover 5% of the operating expenses of the lease, which defendant has refused to pay since August 31, 1985. Both parties filed cross-motions for summary judgment and stipulated to the facts. Defendant appeals from an order of the circuit court of Marion County granting plaintiff's motion for summary judgment in favor of plaintiff on counts I and II and against defendant in the amount of $63,415.67. The trial court determined defendant's unpaid share of operating expenses as $54,620.21 and ordered defendant to pay $8,795.45 in interest. Defendant contends the trial court erred in granting summary judgment for plaintiff on counts I and II. We affirm.

I

The facts in this case are not in dispute. On March 9, 1988, plaintiff filed a one-count complaint against defendant seeking to recover $23,501.77 for defendant's proportionate share of operating expenses from August 31, 1985, through January 31, 1988, on the Kagy lease. The complaint also sought a lien against defendant's interest in the leasehold. Subsequently, plaintiff filed a second and third amended

complaint. The third amended complaint, filed on October 18, 1990, consisted of three counts. Count I sought a judgment against defendant for $43,184 plus any other sums advanced by plaintiff on behalf of defendant prior to the date of judgment plus interest and reasonable attorney fees. Plaintiff also requested that the amount found to be due her be declared a lien upon defendant's working interest in the leasehold. Count II alleged defendant owed plaintiff $25,923.96 for defendant's share of operating expenses. Plaintiff sought judgment against defendant in that amount, plus any additional operating costs attributable to defendant after June 30, 1988, along with costs of the suit. Count III alleged that a mining partnership existed between plaintiff and defendant and that defendant failed to pay her proportionate share of expenses, namely, $25,923.96. Count III sought a money judgment against defendant for that amount plus imposition of a lien against defendant's share of the partnership.

On December 17, 1990, the parties filed a joint cross-motion for summary judgment and stipulated to the facts. The pertinent stipulated facts are as follows:

"From prior to the time Defendant acquired her interest, the lease has been a producing lease. During the time Defendant has had her working interest, monthly payments have been made on or to her account by the purchasing pipeline, Union Oil Company of California, except for certain months when one or more of the wells located on the lease were shut down because of system failures. *** Defendant's account has, since she acquired her interest in the lease, been credited the sum of $90,138.74 as of Sept. 30, 1990.

Since Defendant acquired her interest in the Kagy Lease, there have been expenses of operating the leasehold, and she has been billed monthly for her proportionate share of the expenses. *** Plaintiff has advanced payments to creditors of the leasehold and to leasehold employees and for purchase of supplies and materials and then invoiced co-tenants, including Defendant, each for his/her proportionate share of the monthly operating expenses. ***

From the time defendant acquired her interest in the Kagy Lease, until about October, 1985, Defendant remitted her proportionate share of expenses to Plaintiff, but claims to have no record of such payment. Commencing in October, 1985, Defendant has failed to or refused to remit to Plaintiff for the expenses of operating the leasehold, although her account was credited in April, 1986 the sum of $2,000.00 at the direction of

Plaintiff. Demand has been made for payment of the balance of the assessments for services to the leasehold. Defendant has not participated in the operation of the lease. *** Plaintiff asserts that the Defendant is indebted to her in the amount of $47,987.90 as of Sept. 30, 1990. The sum of $42,130.39 is being withheld by the pipeline as of Sept. 30, 1990, pursuant to liens filed by Plaintiff against Defendant's interest."

The stipulation also consisted of exhibits, including the monthly billing statements from plaintiff to defendant for the period from August 1985 through August 1990. Defendant marked the charges she objected to, a total of $445,095.80. Defendant's 5% proportionate share was $22,254.79. Additionally, each party filed an affidavit of an expert setting forth what each expert would testify to if called as a witness at trial.

Plaintiff's expert, W.C. Jenneman, became familiar with the Kagy lease in 1966 when he was retained by plaintiff's predecessor to render petroleum engineering services for the lease in question. Jenneman still is retained by plaintiff in this capacity. Jenneman reviewed the operating statements since 1985 and concluded that "with the possible exception of certain items amounting to not more than $2500.00 in total," all expenditures were "within the legitimate scope of and necessary for the proper operation of the lease." He stated, "They were essentially expenditures of the kinds and types made in the usual and ordinary course in which oil and gas lease operations are carried on in this area." Jenneman further opined:

"The Kagy lease oil production history is very unusual in that there was a normal expectation that the lease would be economically depleted by about the late 1950's, whereas it is still a significantly profitable operation some forty years later. The lease is presently producing about 20,000 barrels per year.

One of the factors that makes this record of production uncharacteristic is that the operation of the lease has always been administered by the majority absentee owner.

This consistently profitable operation did not come about by accident. In my opinion, it is the result of careful attention by the operator and the consequent employment of exceptionally competent people to do the site work on an around the clock basis.

Chief of these people is the 'pumper' who had the required ability to make immediate repairs when there was any sort of mechanical or electrical breakdown of the pumping equipment; the ability to recognize immediately when a pump was not func-

tioning; the ability to keep meticulous records of production on each well; the ability to do required gauging, testing and treating.

In addition to all of these skills, the pumper had to have a great deal of specialized knowledge and experience in oil field operation in order to handle this lease. The lease was originally developed with 30 completed wells, of which, fifteen are in operation today. For many years the pumper was Cecil Bookhout, who is now retired. He set the standard for the pumpers who succeeded him by establishing outstanding procedures and practices. He is largely responsible for the presently continuing success of this lease.

In this case the operators were able to obtain outstanding pumpers who were willing and able to devote their full time to the job and willing and able to reside on the premises in a house provided by the operator. This on-site residence by the pumper was in this case (with absentee owners) very important in that it provided very good security for the lease. Good security is essential because of potentially serious environmental liabilities whenever there is a faulty line which may result in an accidental oil or salt water spill. In addition 'good security' guards against theft of equipment and temporarily stored oil.

In this case, it is also extremely important to keep the wells pumping with as little down time as possible. Most of the wells on the lease are affected by a water flood being conducted on the adjoining Texaco lease. This operation is pushing oil to these wells on a continuing basis, but will also push past them onto competing leases, if these wells are not in continuance [sic] operation. The presence of a 'full' time pumper provides the necessary surveillance and ability to service these wells promptly in the event of a malfunction."

W.C. Jenneman is a registered professional engineer in the State of Illinois, specializing in petroleum engineering. He holds a bachelor of science degree in petroleum engineering from the University of Oklahoma and has actively engaged in the practice of petroleum engineering for more than 44 years.

Defendant's expert, Marshall Lippert, has been employed in the oil business in Southern Illinois for the past 34 years. Lippert reviewed the same invoices as plaintiff's expert and was also familiar with the Kagy lease. Lippert opined:

"Salaries of employees, Dale Stallons, Wayne Mann and William Hakey; withholding, payroll unemployment or other em-

ployee taxes; pension to former employee Cecil Bookhout; payment to Penny Stallons for bookkeeping; monthly payment to Walter Jenneman, geologist; electric bill for electricity other than for the well motors; propane charges for the house; accounting fees; insurance other than for liability insurance and casualty insurance on the lease equipment; petty cash; phone bill; office supplies; miscellaneous supplies and tools; purchasing of vehicles; truck maintenance, gas and oil for truck; any charges incurred regarding the house including garbage disposal, utilities, repairs, maintenance and improvements; and reserve for plugging wells are not reasonable, usual, or customary charges to a working interest owner. All of the above charges are expenses incurred in the general operation of the operator's business. It is reasonable, usual and customary for an operator to contract with a pumper to perform pumping services at a flat monthly rate and to charge a flat monthly fee for supervision of the leasehold."

The trial court considered the stipulated facts and exhibits, plaintiff's and defendant's experts' affidavits, and the arguments of counsel. Ultimately, the trial court entered summary judgments for plaintiff on counts I and II and for defendant on count III, set a hearing date to determine the exact amount defendant owed, and set a foreclosure date. The trial court also found that the expenses claimed by plaintiff were ordinary and reasonable. As to count III, the trial court found that plaintiff failed to prove the existence of a mining partnership. The parties filed a stipulation as to the current figures which represented defendant's share of operating expenses plus interest. The trial court entered its final judgment on June 4, 1991. Defendant now appeals the trial court's order entering summary judgment for plaintiff on counts I and II.

II

The first issue raised by defendant is whether the trial court erred in granting summary judgment for plaintiff on count I, the lien claim. Defendant raises several arguments concerning count I. First, defendant contends that the Oil and Gas Lien Act (the Act) in place at the time plaintiff filed her complaint bars recovery for charges incurred more than two years prior to recording of the lien. (Ill. Rev. Stat. 1989, ch. 82, par. 510.) Thus, defendant argues, plaintiff is limited in her claim to two years prior to the date of her lien claim. Defendant argues that because plaintiff's claim for a lien was recorded on April 19, 1990, plaintiff is limited to claims arising on April

19, 1988, and thereafter. Plaintiff responds that because the new Act became effective after plaintiff's first two liens were filed, no two-year limitation exists to prohibit those. The two-year limitation period is effective only against the third lien, which was filed after the effective date of the new Act. Thus, all three liens against defendant were effective. We agree with plaintiff.

■ The Act was amended in 1989 and became effective January 1, 1990. (Ill. Rev. Stat. 1989, ch. 82, par. 501 *et seq.*) The new Act specifically limits lien claims to two years prior to their filing in the recorder's office. (Ill. Rev. Stat. 1989, ch. 82, par. 510.) The old Act had no such limitation. See Ill. Rev. Stat. 1987, ch. 82, par. 71 *et seq.*

Here, plaintiff filed three liens against defendant. The first was filed on February 24, 1988, for charges from August 31, 1985, through January 31, 1988. The second was filed on May 16, 1989, for charges from February 1, 1988, through March 31, 1989. The third was filed on April 19, 1990, for charges through March 31, 1990. Plaintiff's complaint in the instant case was first filed on October 18, 1990. With regard to which Act plaintiff should be allowed to recover under, the trial court specifically stated:

> "The statute prior to January 1, 1990, provided a substantive right to interest upon the amount claimed in the lien. This plaintiff advanced services and moneys in light of that statute and filed two liens pursuant to that statute. This court finds that the repeal of the old statute and enactment of the new does not divest the plaintiff of any right to interest she had previously. The lien filed after January 1, 1990 will not carry with it a right to interest."

Plaintiff argued and the trial court ultimately agreed, as do we, that liens valid when filed under the old Act are saved by section 4 of the Statute on Statutes (Ill. Rev. Stat. 1989, ch. 1, par. 1103), which reads, in pertinent part:

> "No new law shall be construed to repeal a former law, whether such former law is expressly repealed or not, as to *** any act done *** or any right accrued, or claim arising under the former law, or in any way whatever to affect any such offense or act so committed or done *** or any right accrued, or claim arising before the new law takes effect, save only that the proceedings thereafter shall conform, so far as practicable, to the laws in force at the time of such proceeding." Ill. Rev. Stat. 1989, ch. 1, par. 1103.

Plaintiff recorded the first two liens prior to January 1, 1990, and we believe she is entitled to proceed under the old Act as to those

two liens. "[A] statute will be deemed to operate prospectively only, and will not be presumed to have retroactive operation unless the language employed is so clear that it will admit of no other construction ***." (*Pratt v. Hayes* (1959), 20 Ill. App. 2d 457, 468, 156 N.E.2d 290, 296.) Here, we believe the statute allows such an interpretation.

■ Defendant also argues that plaintiff should be allowed to proceed under only one Act and not be allowed to rely on those portions of the old Act and new Act which suit her position best. For example, defendant contends, plaintiff sought and received the benefit of the new Act in terms of interest accruing at the statutory rate from the date the services were rendered as opposed to the date the lien claim was filed. However, a review of the judgment order in this case clearly shows that the trial court was well aware of the differing interest provisions between the old Act and the new Act and was consistent in its rulings.

Under section 2 of the old Act, interest accrues from the date the amount was due. (Ill. Rev. Stat. 1987, ch. 82, par. 72.) Under section 2 of the new Act, if no interest is provided for by contract between the parties, interest accrues "from the date of the filing of the lien, at the rate provided for by statute for judgments." (Ill. Rev. Stat. 1989, ch. 82, par. 502.) In the instant case, the trial court found that plaintiff had a right to interest on the first and second liens, but no right to interest on the third lien filed after enactment of the new Act. The parties then stipulated to the amount of interest due plaintiff, and an order was entered for that amount. We agree with the trial court's interpretation of the old Act, and plaintiff does not contest the court's interpretation of the new Act. We do not agree, however, that plaintiff is entitled to a remand for attorney fees.

■ Plaintiff argues in her brief that she is entitled to a remand for attorney fees, which are allowed under the new Act. (Ill. Rev. Stat. 1989, ch. 82, par. 517.) While plaintiff did request attorney fees in count I of her third amended complaint, she failed to request or prove up those amounts after the trial court entered summary judgment for her on counts I and II. Plaintiff is not now entitled to a remand on this issue.

■ Defendant next contends that plaintiff failed to prove her right to recover the charges to which defendant objected under the Act. Defendant argues that it is extremely significant that the trial court found no partnership existed between the parties because numerous charges which might arguably be recoverable against a mining partner are not necessarily recoverable under the Act. Defendant specifically complains about monthly payments made to buy a pickup

truck for the current pumper, monthly pension payments of $437.51 paid to a retired pumper who never rendered any services to the leasehold while defendant owned her interest, arbitrary monthly payments for "reserve plugging," and charges for draperies for the current pumper's home. Defendant contends these are but a few examples that the trial court's judgment gave plaintiff carte blanche to charge defendant for whatever she wants without proving the reasonableness of such charges and without proving such charges are recoverable under the Act against a working interest owner rather than a partner. Plaintiff replies that the challenged expenses are reasonable under the unique circumstances presented here and that the Act does not exclude the expenses challenged by defendant. We agree with plaintiff.

Defendant admits that there are no reported cases addressing the question of exactly what expenses are recoverable under the old or new Act. Both acts contain expansive statements about who is entitled to a lien and for what purpose. Section 2 of the old Act states:

"Any person who shall, under contract with the owner of any land or leasehold for oil or gas purposes, or any pipe line, perform labor or furnish materials, machinery, equipment, tools, or oil well or pipe line supplies, used or employed, or furnished to be used or employed, in the digging, drilling, torpedoing, acidizing, cementing, completing, operating, or repairing of any oil or gas well upon such land or leasehold, or in the construction, maintenance, operation, or repair of any pipe line, or who shall furnish any material, machinery, tools, equipment, or oil well or pipe line supplies, or perform any labor in constructing, putting together, or repairing any of the material, machinery, equipment, tools or supplies used or employed, or furnished to be used or employed, in the digging, drilling, torpedoing, acidizing, cementing, completing, operating or repairing of any oil or gas well, or in the erection, maintenance, operation, or repair of any pipe line, shall be entitled to a lien under this Act for the amount due him for such material, machinery, equipment, supplies, or labor, and interest from the date same was due." (Ill. Rev. Stat. 1987, ch. 82, par. 72.)

Section 2 of the new Act states:

"Persons entitled to lien—amount of lien. Any person including the operator, who shall, under contract with the owner or operator of any leasehold or of any pipeline, perform any labor or furnish any material or services used or employed, perform any labor or furnish any material or services used or employed,

or furnished to be used or employed for, or preliminary to the drilling, completing, equipping or operating of any oil or gas well upon such leasehold, or in the construction of any pipeline, or in the constructing, putting together, or repairing of any materials so used or employed, or furnished to be used or employed, shall be entitled to a lien under this Act, whether or not a producing well is obtained and whether or not such material is incorporated in or becomes a part of the completed oil or gas well, or pipeline, for the amount due him for the performance of such labor or the furnishing of such material or services, including without limitation transportation and mileage charges connected therewith, and interest as provided by the contract between such person and the owner or operator, or if no interest is provided for by contract, from the date of the filing of the lien, at the rate provided for by statute for judgments." (Ill. Rev. Stat. 1989, ch. 82, par. 502.)

Under either Act's definition, we believe the trial court's determination was reasonable.

The trial court's order specifically sets out why it believes the charges are reasonable under the circumstances presented:

"5. Defendant maintains further that the expenses of operation for which she was billed were not ordinary, necessary or reasonable. The parties have submitted statements (plaintiff of Mr. Walter E. Jenneman and defendant of Marshall Lippert) which they stipulate would be the evidence on this issue if the matter was called to trial.

This action involves a group of 15 wells which have been operated profitably much beyond the number of years expected. This has been due largely to the water flooding being done on an adjoining lease by Texaco. The owners and the operator are all absentees. It is true that plaintiff has not operated the wells in the traditional method employed by other operators of individual units. Plaintiff has not billed in the ordinary individual well operator method of actual costs plus overhead plus supervision fee. Instead this plaintiff operator has employed a full-time pumper and has provided the pumper with an on-site residence.

The pumper is the employee of this operator and is paid from the income produced from these wells. As a full-time on-site employee he is provided a vehicle, work clothing, residence and salary. As the court reviews the monthly expenses since January 1986 many items of expense are listed that would not

be ordinary, necessary or reasonable in other circumstances. Indeed, defendant is correct in stating that this operator has operated these several wells like a small business.

The court finds the statement of Mr. Walter C. Jenneman to be persuasive. He describes the need for and benefits of this style of operation under these circumstances. This full-time resident pumper provides continuity and security. By adjoining the Texaco watershed it is critical that there be little down time and the resident pumper helps assume this. The circumstances concerning these 15 profitable wells are not ordinary; however, given these circumstances the expenses incurred are all ordinary, reasonable and necessary."

In this case, both parties agreed that the facts were not in issue, and both moved for summary judgment. The parties agreed that what was contained in the pleadings and affidavits constituted all the evidence and agreed to let the trial court decide the issues without the necessity of an elaborate trial. A court of review will not disturb the findings of a trial judge sitting without a jury if there is any evidence in the record to support those findings. (*Cotter v. Parrish* (1988), 166 Ill. App. 3d 836, 842, 520 N.E.2d 1172, 1176.) However, when the evidence before a trial court is documentary in nature, a reviewing court may make an independent decision based on the facts. (*In re Estate of Hook* (1991), 207 Ill. App. 3d 1015, 1028, 566 N.E.2d 759, 767.) Here, we believe the record supports the trial court's decision.

The record is clear that the circumstances surrounding this oil lease are unique. Both plaintiff and defendant lived in California and were absent for day-to-day operations. Consequently, on-site resident pumpers have been hired over the years to keep the lease producing. This lease is labor-intensive since the instant lease adjoins a Texaco lease which was periodically flooded to achieve secondary oil recovery. The presence of on-site resident pumpers took advantage of this flooding to enhance this lease's recovery. It is undisputed that the lease has produced far beyond the time originally anticipated and that such longevity is the result of the pumper's competence.

The trial court found the affidavit of plaintiff's expert to be persuasive. It explained how the wells had continued to be profitable over the years. We agree with the trial court's determination and its conclusion that the challenged expenses were reasonable under the circumstances herein. But for the pumper's expertise and careful monitoring of the lease, there would be no profits to share. Defendant's 5% return from this lease has been substantial, and we believe the expenses are justified. We do not agree that the trial court's order

gives plaintiff carte blanche to charge whatever she wants. The trial court was presented with a complicated set of facts and did an excellent job of seeing the forest through the trees.

■ Defendant next contends that the trial court erred in granting summary judgment in favor of plaintiff and against defendant under count II of the complaint, an express agreement. We disagree.

Defendant again complains that plaintiff failed to prove the necessity and reasonableness of the objected-to charges in the same manner in which she failed to prove them under count I, the Act. However, because we have previously found that such disbursements were reasonable under the facts presented and because defendant admits in her brief that she "does not dispute that it is implicit in the mere ownership of a working interest that the owner is liable for his or her *pro rata* share of reasonable and necessary operating expenses," we find defendant's contention to be without merit. Thus, we find that the trial court did not err in granting summary judgment for plaintiff and against defendant under either count I or count II.

For the foregoing reasons, the order of the circuit court of Marion County granting summary judgment for plaintiff on counts I and II is affirmed.

Affirmed.

WELCH and LEWIS, JJ., concur.