701 So.2d 1308 (1997)
Mr. and Mrs. Michael SHEPHARD, on Behalf of their deceased minor child, Matthew E. SHEPHARD
v.
Alfred L. SCHEELER, et al.
Nos. 96-C-1690, 96-C-1720.
Supreme Court of Louisiana.
October 21, 1997.
Rehearing Denied December 12, 1997.
*1310 Richard P. Ieyoub, Attorney General, David R. Kelly, Breazeale, Sachse & Wilson, Baton Rouge, for Applicant in No. 96-C-1690.
Stephen R. Barry, Tobin J. Eason, George J. Richaud, Young, Richard, Theard & Myers, New Orleans, for Applicant in No. 96-C-1720.
Sidney D. Torres, III, Gregory J. Noto, Richard A. Tonry, Michael C. Ginart, Jr., Tonry & Ginart, Chalmette, John W. Mumphrey, George N. Bischof, Jr., Stephen R. Barry, Tobin J. Eason, Weiss & Eason, New Orleans, George J. Richaud, Young, Richard, Theard & Myers, New Orleans, for Respondent in No. 96-C-1690.
Richard P. Ieyoub, Attorney General, David R. Kelly, Breazeale, Sachse & Wilson, Baton Rouge, Sidney D. Torres, III, Gregory J. Noto, Richard A. Tonry, Michael C. Ginart, Jr., Tonry & Ginart, Chalmette, John W. Mumphrey, George N. Bischof, Jr., Weiss & Eason, New Orleans, for Respondent in No. 96-C-1720.
KNOLL, Justice.
This action arises out of a fatal accident that occurred on July 6, 1987, on Louisiana Highway 39 (Judge Perez Drive) in St. Bernard Parish. We granted a writ of review to determine whether a proper allocation of fault had been made below. For reasons which follow, we conclude the proper allocation of fault to be 80% Scheeler, 20% St. Bernard Parish Police Jury.
On July 6, 1987, Alfred Scheeler, then sixteen, went for an after school drive in his mother's 1978 Ford F-150 pickup truck. Although a hard rain was falling, Scheeler planned to drive from his home in Meraux to his old house, which had burned down, in Plaquemines Parish. Scheeler was accompanied by two friends, Brandon Lamarque and Matthew Shephard. As the boys headed south along the river, the rain intensified and the truck ran off the road onto the levee. Scheeler claims that this initial incident, which knocked the muffler from the pickup, was caused by an eighteen wheeler that forced him from the roadway.
It took several minutes for Scheeler to reattach the muffler to the pickup. The boys then decided to return home rather than continue onward in the driving rain. The fact that Shephard had an impending dentist's appointment may have been a factor in their decision.
The intensity of the rain began to decrease as Scheeler drove the pickup toward Meraux along the Judge Perez Drive extension, a four lane highway with a wide median and improved shoulders. This extension of Judge Perez Drive had been open for only six years at the time. It was sprinkling as Scheeler negotiated a gradual right to left curve in the roadway. The curve was "super elevated" or banked, with the right lane higher than the left.
Near the end of the curve, Scheeler lost control of his vehicle and the pickup went into a clockwise spin. The pickup spun an unknown number of revolutions over a distance of two hundred feet before striking a St. Bernard Parish dump truck which was stopped partially on the shoulder. At impact, the driver's side of the cab just behind the door collided with the rear left corner of the dump truck. The cab of the pickup truck was crushed by the impact and there was minimal damage to the dump truck. Matthew Shephard was killed in the collision and Scheeler suffered serious injuries. Brandon Lamarque, who was apparently thrown free from the pickup, suffered only minor scrapes *1311 and bruises. Mr. Wallace Couture, the driver of the parish truck, and two parish employees boarding the truck at the time of the accident were also injured in the collision.
About five minutes before the accident, Couture had stopped the dump truck in front of St. Bernard Parish Area 5 Maintenance Yard, located just past the end of the curve, in order to pick up two parish workers. Couture had pulled halfway off the improved shoulder of the road and waited for the workers to board the truck. The two workers were eating lunch at a trailer in the maintenance yard, and were waiting for a break in the rain before running to the dump truck. They had just arrived at the truck when the accident occurred.
The accident spawned several lawsuits which were eventually consolidated for trial. In addition to the civil suits filed by the parties, juvenile proceedings were brought against Scheeler as a result of the accident. Although Scheeler entered guilty pleas to the offenses of negligent homicide and reckless operation of a motor vehicle, evidence of the juvenile proceeding was not allowed by the trial court.
The sole issue at the civil trial was the apportionment of fault between Scheeler, Couture, the St. Bernard Parish Police Jury (the Parish),[1] and the State of Louisiana through the Department of Transportation and Development (DOTD). Plaintiffs asserted that DOTD was liable because the accident was initially caused by a defective condition in the roadway, namely a puddle of standing water in the curve that caused Scheeler to lose control of his vehicle. The plaintiffs also asserted that Couture and the Parish were liable because the presence of the Parish truck on the shoulder and within the "clear zone" of the highway denied Scheeler a chance to regain control of the vehicle and increased the harm caused by the accident. Plaintiffs further asserted the DOTD's liability for allowing the Parish to place a maintenance yard within the "clear zone" of the roadway.
DOTD and the Parish denied liability, asserting that the accident and resulting damages were caused solely by Scheeler's failure to maintain control of his vehicle under the prevailing roadway conditions. DOTD asserts that the roadway was free from defects, and that its design and construction in no way contributed to the accident. The Parish asserts that its truck was legally parked on the shoulder under La.R.S. 32:296(A)(2), and that the accident would not have happened but for Scheeler's negligence.
After extensive discovery, the issue of liability was tried separately on August 2-3, 1993, before Honorable Thomas M. McBride, III. After taking the case under advisement, but before a judgment could be rendered, Judge McBride passed away. In order to spare the expense of a second trial, the parties stipulated that the first trial be transcribed and that the case be decided on the record by Judge McBride's successor, Honorable Robert A. Buckley, Jr.
Judge Buckley issued written reasons on March 20, 1995, in which he assessed 66 2/3% of fault for the accident to DOTD and 33 1/3% to St. Bernard Parish. Scheeler was not assessed any fault in causing the accident and resulting damages. The Fourth Circuit Court of Appeal affirmed, Shephard v. Scheeler, 95-1439, 95-1440, 95-1441, 95-1442, 95-1443 (La.App. 4 Cir. 5/8/96), 674 So.2d 1135.[2] Judge Landrieu dissented, finding Scheeler partly responsible for the accident.
DOTD assigns as error the lower courts' finding that the highway was defective, its failure to find Scheeler solely at fault in causing the accident, and its failure to admit Scheeler's guilty pleas into evidence.
The Parish assigns as error the failure of the lower courts to recognize Louisiana law which permits public vehicles on official business to park on the shoulder. The Parish also asserts that the lower courts misapplied the concept of "clear zone" to a temporarily stopped vehicle, and that they erred in failing *1312 to find Scheeler solely at fault for causing the accident.
The case sub judice was fairly characterized by the trial court as two separate accidents occurring almost simultaneously. The first accident occurred when, for one reason or another, the Scheeler vehicle began to spin out of control. The second accident occurred when the out of control pickup struck the parish truck that was parked partially on the shoulder of the roadway. It is clear that more than one legally responsible cause can contribute to produce harm. When multiple causes are present, a defendant's conduct is a cause in fact when it is a substantial factor generating plaintiff's harm. Dixie Drive It Yourself System New Orleans Co. v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962).
This accident was initiated when the Scheeler vehicle began to spin out of control in a clockwise manner. Two conflicting theories for the loss of control were advanced by the parties. Plaintiffs assert that the accident was caused when the right tires of the Scheeler vehicle entered a deep puddle of standing water in the roadway. The added resistance applied to the right tires by the water caused "differential drag" and caused the pickup to spin in a clockwise direction. DOTD asserts that driver input caused the Scheeler vehicle to spin out of control, and that Scheeler was negligent in failing to maintain control of the vehicle in light of the prevailing weather conditions. It must be initially determined whether a puddle of standing water existed in the roadway, and whether this puddle constituted an unreasonably hazardous condition.
At trial, Scheeler testified that he was driving in the right lane at a speed of around 50 miles per hour. It was raining and he had his wipers on. Scheeler stated he noticed a large puddle in his lane which he estimated to be 1-2 inches deep. He stated that the water covered the entire lane up to the dividing line between the right and left lanes. Although he had driven through other puddles on the road during the drive, this puddle worried him to the extent that he thought about switching lanes. He testified that before he could change lanes, he struck the puddle and the truck spun out of control. He saw the dump truck just prior to striking the puddle. Scheeler vaguely remembers the dump truck being partially in the right lane of the highway and only 20-30 feet from the puddle. The next thing Scheeler remembers is waking up in the hospital. It should be noted that Judge McBride, who presided over the trial of the case, noted Scheeler's "evasiveness" as a witness.
Scheeler's testimony was somewhat corroborated by Brandon Lamarque, whose deposition was admitted in lieu of his live testimony. Lamarque stated that after the pickup ran off the road onto the levee, they headed for home since Matthew Shephard had a dentist's appointment. He stated that they were already about five minutes late when they started down Judge Perez Drive. Lamarque stated that the rain had slacked off a bit and he estimated the speed of the pickup between 45-60 m.p.h. Lamarque stated that there was water on the road, the truck went into the curve, hit a puddle, and started spinning before crashing into the dump truck. He states that although he did not see any water spray when the pickup entered the puddle, he heard the water splash on the bottom of the pickup beneath his seat.
Wallace Couture, the driver of the St. Bernard Parish dump truck, had driven the road five minutes prior to Scheeler. He testified that there were "little puddles all over" on the highway. He stated that there were puddles scattered all over the road, and that "even though it is inclined, they still have low spots in there."
There were several eyewitnesses to the accident. Joseph Major, a passenger in a vehicle driven by a friend of Major's, was deposed prior to trial, and his deposition was admitted into the record. Major was riding on Judge Perez Drive at approximately 45 m.p.h. when Scheeler entered the highway behind his vehicle, just before the curve. Major stated that Scheeler was speeding and that he looked in his rear view mirror and noticed the pickup "spinning a little" as it approached. His vehicle slowed down and Scheeler "came flying past." Major felt that Scheeler continued to accelerate after passing *1313 him, and estimated the pickup's speed at greater than 65 m.p.h. Major stated that once the Scheeler pickup was in the curve, it started spinning and struck the dump truck, which was parked on gravel off the improved shoulder of the road. Major stated that there was no standing water in the road, and that the curve could not hold water because it is on a slant.
Major had also given a written statement on August 31, 1987, which was admitted into evidence. In the statement, Major wrote that he saw the pickup "fish tailing from lane to lane" before it left the highway and struck the dump truck. In his statement, Major wrote that it was raining and that the highway "had water on it."
Pernell King, a back seat passenger in Major's car gave a written statement that paralleled Major's. King stated that in the curve, he noticed the brake lights on the pickup go on before it began swerving from lane to lane. He stated that it then swerved to the right and went off the highway where it struck the dump truck. King stated that it was raining and that there was water on the pavement.
Cheryl Urbeso testified in her deposition that she was driving on Judge Perez Drive just prior to the accident. She stated that it had been raining and that the roads were wet, but that there was no standing water on the road. Urbeso pulled onto the left hand lane of the highway behind the Scheeler pickup. She stated that she was going 45 m.p.h., and that she was not catching up to the pickup. Prior to entering the curve, she saw the pickup put on its brakes and skid "like it was going to go out of control." She stated that the pickup recovered from the skid and continued into the curve. Urbeso then saw the pickup's brake lights go on just before it spun out of control and struck the dump truck, which was parked halfway on the shoulder of the highway. Urbeso testified that there was no standing water in the curve where the pickup went out of control.
Louisiana State Trooper Reuben Berry surveyed the scene approximately 30 minutes after the accident occurred. Trooper Berry took sixty photographs in the course of his investigation of the accident, and he interviewed several eyewitnesses. Trooper Berry filed an accident report in which he concluded:
Accident occurred as a result of poor weather conditions and driver of vehicle no. 2 [pickup] exceeding a safe speed in curve in road due to his driving inexperience. Driver of vehicle no. 2 apparently inattentive or distracted lost control of vehicle no. 2 in the curve. An examination of the road by TFC Berry could find no noticeable defects.
None of the pictures taken by Trooper Berry depict standing water in the roadway in the quantity described by Scheeler. One of the photographs introduced as joint exhibit 47 shows the location where the Scheeler pickup went out of control. Not only does this photo show that there was no standing water near the end of the curve, but it also shows that the slope of the banked curve would prevent any such accumulation of water.[3]
Plaintiff's expert, Mr. Roy Anderson was provided the relevant depositions, police reports, highway plans, and surveys, and he attempted to determine what caused the pickup to spin clockwise. Mr. Anderson also visited the accident site in November of 1992, five and a half years after the accident. Mr. Anderson found the slope of the banked curve was less than was called for in the plans, and that there were ruts in the wearing surface of the highway which could have held enough water to cause the Scheeler vehicle to spin out of control. He also noted a "negative cross slope" in the curve, meaning that the shoulder of the highway was not banked as steeply as the right lane of travel. This would cause a vehicle that accidentally drove onto the shoulder to pull to the right, but would have no effect on the pooling of water in the curve.
Several sets of pictures were introduced by plaintiffs for the purpose of impeaching the *1314 defendant's expert, Mr. Joseph Blaschke. The pictures of Plaintiff's Exhibit 77 were taken over four years after the accident, and they show that the asphalt surface of the road had worn through near the end of the curve.
The trial court noted that the expert witnesses unanimously found that speed was not a factor in the accident, and it concluded that there was standing water on the right side of the highway, in Scheeler's lane of travel, which caused his pickup truck to spin out of control when he drove into it. The trial court based its conclusion on the statements of Scheeler, Lamarque, Major, and Couture, indicating that there was water on the roadway. The trial court was impressed with the reasoning and credentials of Mr. Anderson, and noted Mr. Anderson's testimony that rutting in the roadway could have contributed to the roadway holding water. The court concluded that:
All of that testimony clearly indicates that the roadway held water at the end of the curb where Scheeler lost control of his pickup truck and that the water was present due to the deficient drainage or faulty maintenance of the highway.
* * * * * *
The roadway, in the defect-caused transitory condition that existed at the time of this accident, was not reasonably safe for motorists, especially youthful, inexperienced drivers such as Alfred Scheeler.
The court of appeal affirmed the trial court's finding that the accident was caused by a pool of standing water in the roadway. The court of appeal discounted Trooper Berry's conclusions, noting them as pure speculation, and concluded that Trooper Berry probably did not know that negative cross slope was a roadway defect and that hence he did not notice it. The court of appeal found:
The construction of the highway was defective in that the negative cross-slope caused water to accumulate or puddle upon the highway. The trial court further noted that although this was a new highway, it was defective in that it already had ruts and holes. Those ruts, holes and patches are easily seen in photograph 2 of Plaintiff's Exhibit 77. Expert Roy Anderson... found that the asphaltic concrete mix used in the highway did not meet the specifications of the highway plan and that is the reason for the excessive wearing and rapid deterioration of the highway and the cause of the ruts which held water and caused this accident and Michael Shephard's death. DOTD could have filed third-party claims and brought into this lawsuit the designers, contractors and cement supplier who built this defective highway and used rapidly deteriorating substandard materials. In that case the people who profited financially from the substandard materials would be bearing the loss and not DOTD and the State.
674 So.2d at 1150.
Judge Landrieu dissented, finding that the record clearly indicated that the accident was caused by Scheeler's failure to maintain control of his vehicle. Judge Landrieu noted:
[T]he state police investigating officer, who was on the scene immediately after the accident, found no apparent defects in the road and photographs taken on the same day shortly after the accident make it impossible to believe that a sufficient depth or mass of water covered the right lane of the highway to cause this accident. While it would have been unusual if there were not some puddling on the highway, the road and shoulder are clearly banked in the area where Scheeler lost control and there is no evidence of a depression in this area that would hold any volume of water.
674 So.2d at 1152-53.
Judge Landrieu also noted that Scheeler entered guilty pleas to charges of negligent homicide (La.R.S.14:99) and reckless operation of a motor vehicle (La.R.S.14:32) in juvenile court as a result of this accident. The trial court refused to allow these pleas into evidence, noting that counsel for Scheeler represented that they were pleas of nolo contendere rather than guilty pleas.
The minutes of the juvenile court which were proffered at trial reflect that Scheeler, accompanied by his mother and represented by his attorney, withdrew his pleas of not *1315 guilty and entered pleas of guilty as charged. The minutes note that "all info. read into record today and the record is ordered sealed and not be given out except to D.A. and the Court."
We find that the guilty pleas should have been admitted into evidence as an admission against interest relevant to show fault. The characterization of the pleas by Scheeler's attorney is not persuasive or conclusive as to their actual disposition. The record clearly reflects that guilty pleas were entered by Scheeler rather than pleas of nolo contendere. Although a plea of nolo contendere has no effect beyond the case in which it is entered, a guilty plea to a traffic offense is admissible to show fault. Arceneaux v. Domingue, 365 So.2d 1330 (La.), on remand 370 So.2d 1262 (La.App. 3 Cir.), writ denied, 374 So.2d 660 (La.1979).

STANDARD OF REVIEW
The judge who presided over the trial passed away before a judgment could be rendered. Rather than conduct a second trial, the parties stipulated that the case would be decided by the successor judge, Judge Buckley, based solely on the written record, depositions, and documentary evidence.
Judge Buckley did not hear the live testimony of any of the witnesses. In a footnote to his reasons for judgment, he noted that he would be unable to make credibility determinations based on the demeanor or voice inflections of the witnesses. He stated that he would therefore be more sensitive to other credibility factors for each witness such as the overall reasonableness of the testimony, corroboration by other evidence, consistency with prior statements, and bias or interest of the witness.
On appeal, defendants argued that since the rendering judge did not have the opportunity to view the demeanor of the witnesses, the manifest error standard should not apply to the review of his factual findings. The court of appeal disagreed, noting that in Virgil v. American Guar. & Liab. Ins. Co., 507 So.2d 825 (La.1987), the Supreme Court held that the manifest error standard applies even when the evidence before the trier of fact consists solely of written reports, records, or depositions. Furthermore, the court of appeal noted that defendants were bound by their stipulation to allow Judge Buckley to review the written record in lieu of another trial. Finally, the court of appeal applied both the manifest error standard and an independent de novo review of the record to Judge Buckley's rulings. The court of appeal held that irrespective of the standard applied, the outcome was the same; the court of appeal agreed with Judge Buckley's findings.
Virgil v. American Guar. & Liab. Ins. Co., 503 So.2d 45 (La.App. 5 Cir.), writ granted, 507 So.2d 825 (La.1987), involved a worker's compensation claim in which the primary issue was the extent of the claimant's disability. The claimant and his mother testified at trial, and medical evidence was submitted in the form of hospital records and the depositions of several physicians. In reviewing the decision of the trial court, the court of appeal held that the manifest error rule did not apply to the medical findings, where the trier of fact relied purely upon written reports, records, or depositions. The court of appeal held that it was in the same position as the trial court in assessing the documentary medical evidence. This ruling of the court of appeal was based on the prevailing circuit court jurisprudence at the time. See Dickerson v. Zurich-American Ins. Co., 479 So.2d 571 (La.App. 1 Cir.1985); Woodard v. George Cole Chevrolet, Inc., 444 So.2d 1367 (La.App. 2 Cir.1984); Gould v. State through La. Dept. of Correct., 435 So.2d 540 (La.App. 1 Cir. 1983), writ denied, 438 So.2d 1107 (La.1983); Schwarz v. Bourgeois, 422 So.2d 1176 (La. App. 4 Cir.1982), writ denied, 429 So.2d 153 (La.1983); Farris v. Ducote, 293 So.2d 589 (La.App. 3 Cir.), writ denied, 295 So.2d 814 (La.1974).
In Virgil v. American Guar. & Liab. Ins. Co., 507 So.2d 825 (La.1987), a per curiam opinion,[4] this court reversed the court of *1316 appeal, holding that Louisiana's three-tiered court system allocates the fact finding function to the trial court, and that because of this institutional function great deference is accorded to the trial court's factual findings, even when the record consists solely of documentary evidence. In Virgil, we stated:
The manifest error standard and its purpose were stated succinctly in Canter v. Koehring Co., 283 So.2d 716 (La.1973) as follows:
"... The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts." (emphasis supplied)
Louisiana's three-tiered court system allocates the fact finding function to the trial courts. Because of that allocation of function,... great deference is accorded to the trial court's factual findings, both express and implicit, and reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on appellate review of the trial court's judgment.
Virgil, supra at 826.
The manifest error standard of review is well established and recognized in our jurisprudence. The rigid and strenuous application of manifest error review has served the judicial process well. A lesser standard, albeit when a case is submitted to the trial court solely upon a written record, unduly undermines the allocation of the fact finding function to the trial courts.
We recognize that a good and persuasive argument can be made to lessen the standard of review when evaluations and findings of fact are not based upon demeanor evidence. A review of the jurisprudence of our sister states who have addressed this issue reveals that the majority of states have held that great deference need not be extended to the trial court when its findings of fact are based on depositions, affidavits, and other documentary evidence.[5] Nevertheless, a minority of states adhere to the rule that even when considering documentary evidence, an appellate court must find clear error to overrule the trial court's findings of fact.[6]
*1317 After carefully studying this issue, we find that the proper allocation of trial and appellate functions between the respective courts are better served by the heightened standard of manifest error review. Therefore we use this occasion to reaffirm our pronouncement in Virgil.

LIABILITY OF SCHEELER
It is not disputed that it was raining and the roads were wet. A small amount of puddling would be impossible to prevent, and for the most part these puddles pose no unreasonable danger to the traveling public. See Lazarus v. Southern Farm Bureau Cas. Ins. Co., 535 So.2d 923 (La.App. 2 Cir.), writ denied, 536 So.2d 1201 La.1988). However, we note that our courts have recognized that excess or standing water in the roadway is unreasonably dangerous. See Coley v. State, Through DOTD, 621 So.2d 41 (La.App. 2 Cir.1993).
The trial court clearly erred in finding that the accident was caused by an unreasonably dangerous puddle of standing water at the end of the curve. Substantial and competent evidence revealed that there was no standing water in the road. Although all of the fact witnesses testified that there "was water on the road" or that the "road was wet," only Scheeler himself testified that there was a large puddle of standing water that caused the accident. Most of the independent witnesses to the accident stated that there was no standing water on the road. Their testimony is completely reconcilable, since there is quite a difference between a "wet roadway" and a puddle of standing water.
The photographs taken by Trooper Berry the same afternoon as the accident clearly show that there was no excess or standing water on the highway where the Scheeler vehicle spun out of control. These photographs illustrate that the highway was in excellent condition, and that the area where the accident occurred was inclined and incapable of holding standing water in the amount described by Scheeler. Scheeler's assertion that a 1-2 inch deep pool of standing water caused him to lose control is implausible in light of the photographs taken by Trooper Berry.
The lower courts in this case clearly erred by basing their ruling at least partially on plaintiff's exhibit 77, photographs that were taken several years after the accident. We note that these pictures were admitted by the trial court solely for the purpose of impeachment and have no substantive evidentiary value since contemporaneous pictures of the accident site were available.
We have reviewed all of the photographs in the record, and we agree that over the years, there is a progressive deterioration in the surface of the roadway.[7] However, the photos taken on the day of the accident clearly substantiate Trooper Berry's report, that this was a highway without standing water and without noticeable defect in the area where Scheeler lost control of his vehicle.[8] The fact that this road deteriorated after the accident is irrelevant and no proof that it was defective on the day this accident happened. Contrast Coley v. State, Through DOTD, supra, in which photographic and eyewitness evidence clearly proved excess or standing water at the accident site on the day of the accident.
We further find that the testimony of plaintiff's expert, Mr. Anderson, upon whom the lower courts erroneously based their findings of fact, cannot accord much weight. The record clearly reveals that Mr. Anderson's opinion, that substandard materials in the roadbed were responsible for the *1318 pooling that Scheeler described, was based on an inspection of the roadway that took place over five years after the accident, on photographs taken several years after the accident, and on the implausible testimony of Scheeler. On the other hand, independent eyewitness accounts that there was no standing water on the road is consistent with inspections on the day of the accident and photographs taken the same day by the Louisiana State Trooper. From the photographs, one can clearly see that the slope of the roadway makes it implausible that there was any standing water in the right lane on which Scheeler had been driving.
A presumption of negligence arises when a driver leaves his own lane of traffic and strikes another vehicle. In such a case, the burden of proof on such a defendant motorist is to show that he was not guilty of any dereliction, however slight. A motorist has a duty to maintain control of his vehicle, even in rainy weather. Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742.
The record evidence does not support Scheeler's claim that the accident was caused by a pool of standing water near the end of the curve. Scheeler's story is implausible considering the objective evidence and the statements of the independent eyewitnesses. The accident was not caused by a defective condition of the highway, but rather because of Scheeler's negligent failure to maintain control of his vehicle. Accordingly, we find Scheeler at fault for causing this accident.

LIABILITY OF ST. BERNARD PARISH
As did the trial court, we conclude that once Scheeler lost control of the vehicle, there was nothing he could do to avoid colliding with the dump truck. The record reflects that had Couture parked completely off the paved shoulder of the road, the collision that killed Matthew Shephard would not have occurred. We therefore conclude, as did the trial court, that the Parish was at fault for parking their dump truck in a space which should have been available for Scheeler to recover control of his pickup.
Couture stopped at the maintenance yard several times a day, and more often than not, he stopped his dump truck on the shoulder of the road in front of the maintenance yard rather than driving into the yard to pick up workers. Couture testified he had been instructed by his supervisor to pick up workers in this manner. Furthermore, the record reflects the Parish had placed a bed of shells and gravel just off the paved shoulder of the road and encouraged its employees to park their personal vehicles there. There was ample space for Couture to park the truck so that it would not have obstructed the shoulder of the highway.
The Parish asserts that Louisiana law permits public vehicles to stop temporarily on the shoulder of a roadway while conducting official business. The Parish cites La.R.S. 32:296, which provides:
A. No person shall stop, park, or leave standing any unattended vehicle on any state highway shoulder when such stopping or parking on the highway shoulder shall obstruct the flow of traffic or is a hazard to public safety, unless such stopping, parking, or standing is made necessary by an emergency, except:
(1) In those areas designated as parking areas by the Department of Transportation and Development, or
(2) By any public utility personnel or public utility equipment engaged in the operation of the utility business, public vehicles owned by public bodies which are engaged in the conduct of official business, or privately-owned vehicles which are engaged in services authorized by the local governing authority.
B. In case of an emergency, the driver of such vehicle must operate it in accordance with the normal standards of prudent conduct to protect himself and others from harm.
While we acknowledge that the Parish was not in violation of La.R.S. 32:296, this fact alone does not absolve it of liability. La.R.S. 32:296 is not a grant of immunity to public entities, and the shoulder of the highway is not a "safe harbor" for any public vehicle, even those on official business. The fact that the dump truck was a parish vehicle *1319 on official business simply absolves it of statutory liability or a finding of liability per se under La.R.S. 32:296, it does not preclude a finding of liability based on other grounds. In Pierre v. Allstate Insurance Company, 257 La. 471, 242 So.2d 821 (1970), this court stated:
Criminal statutes are not, in and of themselves, definitive of civil liability. They are, however guidelines to which a court may resort to establish the proper standard of care for assigning civil liability. Criminal statutes do not set forth the civil rule; it is the court which by analogy must determine whether the statutes can define the rule to be applied in civil cases.
Pierre, supra, at 830.
While we recognize that La.R.S. 32:296 gives public entities the right to use the shoulder in the conduct of its official business, La.R.S. 32:296 does not allow those public entities to completely disregard the safety of others in using the shoulder. Public entities using the shoulder under La.R.S. 32:296 are still required to do so in a reasonably prudent manner, and with reasonable regard for the safety of the motoring public.
The primary safety purpose of the paved shoulder of the highway is to provide an area for motorists who require a momentary stop, and to protect a motorist who inadvertently leaves the roadway. Campbell v. DOTD, 94-1052 (La.1/17/95), 648 So.2d 898. Whether the Parish's use of the shoulder was unreasonably dangerous depends upon the facts and circumstances of each case. Hunter v. Dept. of Transp. and Dev., 620 So.2d 1149 (La.1993).
The occasional and transitory use of the shoulder by stopped vehicles is not incongruous with its function as a safety device. Nevertheless, when the use of the shoulder is regular and routine, the safety function is mitigated. This is especially true when such use occurs near the end of a curve in a rural highway, where the chances of a vehicle leaving the traveled portion of the roadway are increased. We find the continuous use of a fixed area of the shoulder as a parking lot or a regular embarkation point for Parish workers unreasonably impairs its safety function as a recovery area.
We also note that Couture had ample room to park the dump truck off the paved shoulder of the highway, but he failed to do so. The record in the instant case reflects that the Parish had installed a shell and gravel parking area adjacent to the shoulder, and that this area was available to Couture for the purpose of parking the dump truck on the day of the accident.
In the case sub judice, the probability of the harm and gravity of the harm caused by the Parish's parking truck on the shoulder greatly outweighed the cost of avoiding the risk by parking elsewhere. The use of the shoulder in a consistent and continuous manner rather than a transitory manner, accompanied by the failure to utilize an available safe area to park the truck constituted an unreasonable risk of harm to motorists. We therefore hold that the Parish breached its duty to use the shoulder in a reasonably safe manner, and that this breach was a legal cause of the accident. The harm that occurred in the instant case was the very risk of harm contemplated by the duty to use the paved shoulder in a reasonable manner, namely that a vehicle that leaves the traveled portion of the highway would collide with a vehicle stopped in the recovery area.

LOCATION OF THE PARISH MAINTENANCE YARD
The location of the parish maintenance yard partially within the "clear zone" of the highway, and the maintenance yard's encroachment on the DOTD's 90 foot right of way for the highway in violation of AASHTO standards does not mandate liability unless it was a cause in fact of the accident. See, e.g., Mart v. Hill, 505 So.2d 1120 (La.1987).
We initially note that the Scheeler vehicle struck only the left rear corner of the dump truck, and it did not strike any portion of the maintenance yard. There is no evidence in the record that the distance between the maintenance yard and the highway had any effect on this accident. We find no support in the record for a conclusion that the location of the maintenance yard further back from the highway would have prevented the *1320 accident. Such a conclusion would be speculative and unreasonably stretches causation. This is especially true since the record shows that Couture could have pulled the dump truck further from the road, but that he chose to park on the shoulder. Accordingly, we hold that the Parish and the DOTD are not liable for the placement of the parish maintenance yard within the highway right of way.

APPORTIONMENT OF FAULT
As noted earlier, the collision between the pickup and the dump truck can be fairly characterized as two accidents occurring almost simultaneously. The accident would have not have occurred but for Scheeler's failure to maintain control of his vehicle. Scheeler's breach of his duty to control his vehicle under the inclement weather conditions was the most significant factor in causing the harm in this accident. However, the regular and routine occupation of the shoulder of the highway by the parish dump truck created an unreasonable risk of harm to motorists, especially motorists who leave the traveled portion of the roadway. Similarly, the failure of Couture to park in the area provided adjacent to the roadway posed an unreasonable risk of harm. The Parish's claim that Scheeler's negligence is the sole cause of the damages in this case is tantamount to a claim that the spinning of the pickup truck killed Matthew Shephard and caused Scheeler's injuries. Clearly, the Parish's occupation of the shoulder denied Scheeler an opportunity to regain control of his vehicle and was a factor in causing the harm in this accident. Given these circumstances, analyzing the fault of Scheeler and the Parish in causing the harm in this accident, we assign fault 80% to Scheeler and 20% to St. Bernard Parish.

DECREE
For the reasons assigned, the claims against the State of Louisiana through Department of Transportation and Development are dismissed with prejudice. The judgment of the court of appeal allocating fault in this case is amended and recast in the following proportions: Alfred Scheeler 80%, St. Bernard Parish Police Jury 20%. This case is remanded to the district court for further proceedings consistent with the views expressed herein.
REVERSED IN PART; AMENDED IN PART, AND AFFIRMED IN PART.
CALOGERO, C.J., concurs in part, dissents in part and assigns reasons.
TRAYLOR, J., dissents and assigns reasons, and concurs in part.
JOHNSON, J., dissents and assigns reasons.
LEMMON, J., not on panel. Rule IV, Part 2, Sec.3.
*1321 
CALOGERO, Chief Justice, concurring and dissenting in part.
I agree with the majority's finding error in the district court's and court of appeal's exonerating the driver Scheeler from fault. In particular the majority is correct in its determination that the juvenile proceedings evidencing Scheeler's guilty plea (and not a nolo contendere plea) should have been admitted into evidence. On the other hand, I would give greater deference to the trial court's findings regarding fault on the part of both the State and the Police Jury, for the exhaustive reasons given by the trial court.
In my view, however, a more accurate assessment of fault would have the Police Jury, the State and the defendant Scheeler each found equally at fault, that is, 33 1/3% each.
TRAYLOR, Justice, concurring in part and dissenting in part.
I agree with the majority that the trial court committed manifest error in failing to *1322 find that Scheeler, the driver, was at fault. I further agree that Scheeler's guilty plea in juvenile court was admissible. Finally, I agree that the claims against the State should be dismissed with prejudice.
I do not agree, however, with the majority's finding that St. Bernard Parish was 20% at fault in this matter. Scheeler was driving too fast for the conditions, lost control of his vehicle, and struck a parish dump truck which was legally parked on the shoulder of the road. I would find that Scheeler was 100% at fault and that the Parish bears no fault at all.
JOHNSON, Justice, dissenting.
In my opinion, the evidence established that weather conditions and speed were the substantial factors in this accident.
The location of the parish maintenance yard and the position of the dump truck on the shoulder of the roadway were not substantial factors in causing this accident. La. R.S. 32:296 specifically provides for the temporary stoppage of public utility vehicles off roadways. Therefore, the St. Bernard Parish dump truck was legally stopped at the time of the accident. The maintenance yard was also not the cause of the accident. A fence located 30 feet from the paved portion of the highway does not create an unreasonable risk of harm. To say that the occupation of the shoulder denied Scheeler the opportunity to regain control of his vehicle is pure speculation.
It was pouring rain when the accident occurred. Scheeler testified that a puddle 1-2 inches deep caused his car to spin out of control. Other testimony does not substantiate that a puddle that deep existed. The photographs taken at the scene of the accident by State Trooper Berry do not reveal water on the roadway in the quantity described by Scheeler. Cheryl Urbeso, an eyewitness, testified that the roads were wet but there was no standing water on the road. Although it was raining, other drivers were able to safely navigate this highway. Wallace Couture, the driver of the St. Bernard Parish dump truck, testified that there were puddles all over the highway. Yet, he was able to negotiate the highway in question.
James Mayor, an eyewitness to the accident, testified that Scheeler "came flying past" him and was going faster than 65 miles per hour. This driver was also able to travel safely along this highway. At 45 miles per hour, Cheryl Urbeso was able to navigate safely upon this highway. Scheeler admittedly was going at least 50 miles per hour. State Trooper Berry's report attributed the accident to the inexperience of the driver and his excessive speed. A more experienced driver would have reduced his speed under these driving conditions.
From all the evidence, the Scheeler vehicle was already out of control prior to hitting the Parish dump truck. I would hold the driver 100% liable for this accident.
NOTES
[1] In January 1992, St. Bernard Parish changed its form of government from police jury to parish council.
[2] Judge Buckley's written reasons are reported in their entirety in the court of appeal opinion.
[3] We attach as an Appendix, joint exhibit 47, a photograph of the end of the curve where the Scheeler vehicle began to spin out of control. Exhibit 47 was taken by Trooper Berry on the afternoon of the accident.
[4] We note that this court in its per curiam opinion in Virgil does not clearly show that Virgil was a mixed trial of live testimonies and other documents. The facts are clearly shown in the court of appeal opinion.
[5] See, Dana Commercial Credit Corp. v. Hanscom's Truck Stop, Inc., 141 N.H. 131, 679 A.2d 570 (N.H., Jun. 11, 1996); Garner-Roe v. Anderson, 894 S.W.2d 223 (Mo.App. E.D., Feb. 28, 1995); Bell v. Brittain, 19 Kan.App.2d 1073, 880 P.2d 289 (Kan.App., Sep. 02, 1994); Jones v. Herald, 881 P.2d 116 (Okla.App., Aug. 16, 1994); Purvis v. Hartford Acc. and Indem. Co., 179 Ariz. 254, 877 P.2d 827 (Ariz.App. Div. 1, Apr. 12, 1994); Summers v. Hagen, 852 P.2d 1165 (Alaska, May 28, 1993); Matlow v. Rosenfeld, 245 Ill.App.3d 448, 614 N.E.2d 520, 185 Ill.Dec. 386 (Ill.App. 5 Dist., May 21, 1993); Scovill Fasteners, Inc. v. Sure-Snap Corp., 207 Ga.App. 539, 428 S.E.2d 435 (Ga.App., Feb. 26, 1993); Sevigny v. New South Federal Sav. and Loan Ass'n, 586 So.2d 884 (Ala., Aug. 23, 1991); Appling v. Federal Land Bank of Wichita, 816 P.2d 297 (Colo. App., Jul. 18, 1991); Greater Middleton Ass'n v. Holmes Lumber Co., 222 Cal.App.3d 980, 271 Cal.Rptr. 917 (Cal.App. 1 Dist., Aug. 03, 1990); Traub v. Traub, 135 So.2d 243 (Fla.App. 2 Dist., Dec. 06, 1961); Stafford v. Stafford, 618 S.W.2d 578 (Ky.App., Jun. 19, 1981); Mississippi State Highway Commission v. Dixie Contractors, Inc., 375 So.2d 1202 (Miss., Oct. 10, 1979); State Farm Mut. Auto. Ins. Co. v. Budd, 185 Neb. 343, 175 N.W.2d 621, 44 A.L.R.3d 476 (Neb., Mar. 20, 1970); Sommer v. Kridel, 153 N.J.Super. 1, 378 A.2d 774 (N.J.Super. A.D., Jun. 12, 1975); Lowe v. Bloom, 112 N.M. 203, 813 P.2d 480 (N.M., Jun. 12, 1991); Buschke v. Dyck, 197 Or. 144, 251 P.2d 873 (Or., Dec. 19, 1952); Butler County v. Brocker, 455 Pa. 343, 314 A.2d 265 (Pa., Jan. 24, 1974); First Nat. Bank of Biwabik Minnesota v. Bank of Lemmon, 535 N.W.2d 866 (S.D., Aug. 02, 1995); Lloyds Cas. Insurer v. Shafer, 267 S.W.2d 588 (Tex.Civ.App.-Austin, Apr.21, 1954); Lindgren v. Lindgren, 58 Wash.App. 588, 794 P.2d 526 (Wash.App., Jul. 23, 1990); Zurbuchen v. Teachout, 136 Wis.2d 465, 402 N.W.2d 364 (Wis.App., Jan. 21, 1987).
[6] See, Casco Northern Bank v. JBI Associates, Ltd., 667 A.2d 856 (Me., Nov. 30, 1995); Bumgarner v. Bumgarner, 124 Idaho 629, 862 P.2d 321 (Idaho App., Oct. 04, 1993); Matter of Estate of Custick, 842 P.2d 934 (Utah App., Dec. 04, 1992); First Trust Co., Inc. v. Union Depot Place Ltd. Partnership, 476 N.W.2d 178 (Minn.App., Oct. 15, 1991); Admiral Builders Sav. and Loan Ass'n v. South River Landing, Inc., 66 Md.App. 124, 502 A.2d 1096 (Md.App., Jan. 14, 1986); Mills Acquisition Co. v. Macmillan, Inc., 559 A.2d 1261 (Del.Supr., May 03, 1989); Farner v. Farner, 480 N.E.2d 251 (Ind.App. 1 Dist., Jul. 17, 1985); Hanson v. Williams County, 452 N.W.2d 313 (N.D., Mar. 01, 1990); Zifcak v. Greater Woonsocket Bd. of Realtors, Inc., 117 R.I. 9, 362 A.2d 763 (R.I., Aug. 02, 1976).
[7] Four sets of photographs were introduced or proffered: from July 6, 1987, to August, 1988, to sometime in 1991, to just prior to trial in 1993.
[8] We note that the reviewing court incorrectly cited "negative cross slope" as a defect responsible for accumulated water on the roadway. "Negative cross slope" means that the shoulder was not banked as steeply as the road. The expert testimony clearly showed that this defect would only be relevant had Scheeler's speed been too great to negotiate the curve. As stated earlier, all experts agreed that speed was not a factor. The record reflects that even if the curve were not banked, Scheeler could have negotiated it at a much higher speed.