843 So.2d 565 (2003)
Frances Turner WEST, on behalf of her minor son, Lamareo J. West, and Sherry Lambert WEST, on behalf of her minor children, Jamarea Lambert West and Beau Lambert West, Plaintiff-Appellant,
v.
Johnnie WATSON, Beatrice Watson, Howard Watson, Specialty Risk and Associates, and Lloyd's Underwriters at London, Jointly and in Solido, Defendant-Appellee.
No. 37,100-CA.
Court of Appeal of Louisiana, Second Circuit.
April 9, 2003.
*566 S.P. Davis, for Appellant.
John C. Turnage, Shreveport, for Appellee, Johnnie Watson.
John C. Anderson, Robert W. Fenet, Baton Rouge, J. Konrad Jackson, for Appellee, Lloyd's London.
Before WILLIAMS, CARAWAY and DREW, JJ.
WILLIAMS, J.
Plaintiffs[1] appeal from a summary judgment in favor of the defendant, Certain Interested Underwriters at Lloyd's, London ("Lloyd's"). The trial court held that an "intentional injury exclusion" provision precluded coverage for a shooting death which occurred on the property of the insured. For the following reasons, we affirm.

FACTS AND PROCEDURAL HISTORY
On August 15, 1999, Johnnie Watson ("Watson") shot and killed Jimmy Lee West ("West"). The shooting occurred on the property of Watson's mother, Beatrice, with whom Watson lived. West's children sued Johnnie and Beatrice Watson and Ms. Watson's homeowners' insurance carrier, Lloyd's.
Thereafter, the trial court granted Lloyd's motion for summary judgment. Plaintiffs appealed, and this Court reversed the judgment, remanding the case to the trial court to allow the plaintiffs to depose Watson. West ex re. West v. Watson, 35,278 (La.App.2d Cir.10/31/01), 799 So.2d 1189, writ denied, 01-3179 (La.2/8/02), 808 So.2d 140. Prior to the *567 taking of his deposition, Watson pled guilty to manslaughter. After Watson was deposed, Lloyd's reurged its motion for summary judgment. The trial court again granted the motion and dismissed Lloyd's from the lawsuit.
The insurance policy in question contains the following provisions:
DEFINITIONS
In this policy, "you" and "your" refer to the "named insured" shown in the Declarations and the spouse if a resident of the same household. "We," "us," and "our" refer to the Company providing this insurance. In addition certain words and phrases are defined as follows:
. . . .
3. "Insured" means you and residents of your household who are:
a. Your relatives; ...
. . . .
5. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in:
a. "Bodily injury"; or
b. "Property damage."
Further, the policy contains an intentional injury exclusion for liability coverage. That exclusion provides:
SECTION IIEXCLUSIONS
1. Coverage EPersonal Liability and Coverage FMedical Payments to Others do not apply to "bodily injury" or "property damage":
a. Which is expected or intended by one or more "insureds"...
Among the exhibits relied upon by Lloyd's in seeking summary judgment was the Boykin colloquy entered when Watson pled guilty to manslaughter on January 18, 2001. Watson was originally charged with second degree murder.
The transcript of the guilty plea reflects, in part:
Court: Will the D.A. state the facts.
Mr. Edwards, Assistant District Attorney: Your Honor, on or about August 15th, 1999, Johnny Bell Watson, Jr., committed the offense of manslaughter; in that, he did with specific intent to either kill or to inflict great bodily injury upon Jimmy West did, in fact, kill Jimmy West on that date. And, at the time of the offense, it was committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of self-control and cool reflection; and that, at the time of the homicide, the Defendant's blood had not actually cooled and an average person's blood would not have cooled at the time the homicide was committed. Specifically, on that date, in Shreveport, Louisiana, the defendant is (sic) neighbors of Jimmy West. Mr. West lives acrosslived across the street from the Defendant. There had been numerous occasions in the past where the defendant had called the police on Jimmy West regarding noise violationor noise violations of parties that Jimmy West would have in his house.
On this particular date, the defendant had called the police on at least two occasions on that night regarding noise violations going on at the residence of Jimmy West.
On that night at approximately nine o'clock in the evening, the defendant was backing his car out of the driveway and stopped on the street along the curb. Jimmy West and a(sic) associate of Jimmy West, a Steven Anderson, observed the defendant in his vehicle.
They approached the defendant's vehicle, and they were in thatthey were *568 yelling and announcing in a loud language how upset they were that the defendant had called the police on them. And, as they approached the defendant's vehicle, the defendant fired approximately five or six shots at the individuals. Three of these shots did hit Jimmy West, and it was the third of these shots that resulted in Jimmy West's death, in that it went through and destroyed his kidney, and he died of blood loss from that event.
The defendant was later interviewed by the police detectives. He stated that he never saw a weapon on either individual. He said that Jimmy West was holding his hand funny and he might have a weapon, but he never saw a weapon. He admitted that he never gave any threats or warnings to either individual to get away from his car. He just started shooting as they approached his vehicle.
He also admitted that these individuals had called him names before in the past and no violence had ever occurred to him before from these two individuals. He also admitted to firing as they were also in the process of running from his vehicle. All these facts occurred in Caddo Parish.
Court: Are those facts correct?
Johnnie B. Watson, Jr. (Watson): Yes, sir.
Court: Is your decision to plead guilty your own decision?
Watson: Yes, sir.
Court: Has anyone forced you or coerced you to plead guilty?
Watson: No, sir.
Court: Do you understand and have your attorneys ... explained to you the nature and elements of the crime of manslaughter?
Watson: Yes, sir.
Court: Do you understand that is what you are pleading guilty to?
Watson: Yes, sir.
Court: Have they also explained to you the nature of the crime of second degree murder, which you were originally charged with?
Watson: Yes, sir.
Court: Do you have any questions about what you are pleading guilty to?
Watson: No, sir.
Court: Do you have any questions about anything?
Watson: No, sir.
At his September 5, 2002 deposition, the attorneys questioned Watson about the shooting incident. Watson testified that he had just backed out of his mother's driveway and on his way to work, when he saw Jimmy West and another man, Steve Anderson, break out of a crowd of nine or ten people and begin walking toward him. Watson refused to give a numerical estimate of the distance between him and West when he began shooting; he referred to a wall in the room where the deposition was held that one attorney roughly estimated to be 30 to 35 feet away. Watson further testified that "he stepped out of his car before he began shooting."
The pertinent portions of the deposition testimony read as follows:
Q: Now, at the time that you began to fire the shots, Mr. Watson, did you intend to kill Jimmy West, did you intend to kill Steve Anderson, or did you intend to scare them or to warn them? What was going on in your mind? What was your intent?
A: My intent was to stop them.
Q: Okay. It was to stop them?
A: I wasn't trying to kill nobody.
Q: Okay. So your intent was toif you could have shot him in the leg or shot *569 him in the foot or shot him anywhere to stop him from coming towards you is what you are saying; is that correct?
A: Like I say, it happened so fast. Hell, I just started shooting.
Q: I understand. Were you afraid?
A: Yeah, I was afraid. That's why I started shooting.
. . . .
Q: What were the lighting conditions where you were sitting in your car to where Jimmy West and Steve Anderson were up the street? I know it was dark. What was it like? Were the streets well lit? Was it dark? Could you clearly see who you were looking at or you could not?
A: To tell you the truth, I was surprised I hit the guy. And when hethe detective told me he had so manyfrom the position that I hit him, I was surprised, because, hell, I was just shooting.
Q: You were just shooting? You were not directly aiming at him or any specific body?
A: Yeah, I was directly aiming at him, but I could hardly see that night. And I was surprised I hit him so many times, to tell you the truth.
. . . .
Q: Now, once you were firing your weapon, what did Johnny-Jimmy West, I'm sorry, and Steve Anderson do? Did they stay at the area where they were or did they run, or what did they do?
A: When I initially started shooting, the Anderson guy took off running, which means he took off running in the east direction. And when I started shooting at Jimmy, and obviously I hit him, it looked like he was trying to move in an upward position or something.
Q: An upward position?
A: Like trying to turn or run.
Q: Okay. Did you see him run?
A: Like I say, it happened so fast, you know. It was just a split of a second. Like I said, I just started shooting.
Throughout the deposition, Watson repeatedly denied that he had intended to kill West. He testified that he believed West had "something" in his hand as he came toward him.
The trial court issued verbal reasons for judgment in support of its grant of summary judgment. The court stated, in pertinent part:
It states very clearly in the colloquy on the Boykinization that he admitted that he did with specific intent to either kill or inflict great bodily injury on Jimmy West (sic) in fact kill him.
He also admits that he was shooting at him as he was running away from the vehicle. Now, (sic) a deposition taken later he denies some of that. But I think we're in the situation of the defendant trying to create his own dispute of material fact and I don't think that's allowed. And so (sic) grant the motion for summary judgment.
Plaintiffs now appeal from the summary judgment dismissing Lloyd's as a defendant.

DISCUSSION
A motion for summary judgment is proper when the pleadings, depositions, answers to interrogatories and omissions on file, together with any affidavits submitted, show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law. When reasonable minds must inevitably conclude that the mover is entitled to judgment as a matter of law on the facts before the court, summary judgment is warranted. See LSA-C.C.P. art. 966(B); Bijou v. Alton Ochsner Medical Foundation, 95-3074 (La.9/5/96), 679 So.2d 893. The mover has *570 the burden of establishing the absence of a genuine issue of material fact. If the mover will not bear the burden of proof at trial on the matter, then he is required to point out to the court the absence of factual support for one or more elements essential to the adverse party's claim or action. LSA-C.C.P. art. 966(C)(2).
The party opposing summary judgment cannot rest on the mere allegations of his pleadings, but must produce factual support which could satisfy his evidentiary burden at trial. LSA-C.C.P. art. 966(C)(2). Appellate courts review summary judgments de novo under the same criteria that govern the district court's consideration of whether summary judgment is appropriate. NAB Natural Resources v. Willamette Industries, Inc., 28,555 (La.App.2d Cir.8/21/96), 679 So.2d 477.
In Row v. Pierremont Plaza, L.L.C., 35,796 (La.App.2d Cir.4/3/02), 814 So.2d 124, writ denied, 02-1262 (La.8/30/02), 823 So.2d 952, this court stated:
Despite the legislative mandate that summary judgments are now favored, factual inferences reasonably drawn from the evidence must be construed in favor of the party opposing the motion and all doubt must be resolved in the opponent's favor.... Furthermore, as noted by the supreme court ... the trial court cannot make credibility determinations on a motion for summary judgment. It is not the function of the trial court on a motion for summary judgment to determine or even inquire into the merits of the issues raised. Additionally, the weighing of conflicting evidence has no place in summary judgment procedure.
814 So.2d at 128.
In Breland v. Schilling, 550 So.2d 609 (La.1989), the supreme court interpreted an intentional injury exclusion almost identical to the exclusion in this case. The court stated:
[W]hen minor bodily injury is intended, and such results, the injury is barred from coverage. When serious bodily injury is intended, and such results, the injury is also barred from coverage. When a severe injury of a given sort is intended, and a severe injury of any sort occurs, then coverage is also barred. But when minor injury is intended, and a substantially greater or more severe injury results, whether by chance, coincidence, accident, or whatever, coverage for the more severe injury is not barred. Whether a given resulting bodily injury was intended "from the standpoint of the insured" within these parameters is a question of fact. Such factual determinations are the particular province of the trier of fact, in this instance the trial jury.
The insured's subjective intent or expectation must be determined not only from the insured's words before, at the time of, and after the pertinent conduct, but from all the facts and circumstances bearing on such intent or expectation. Yount v. Maisano, 627 So.2d 148 (La.1993); Great American Insurance Company v. Gaspard, 608 So.2d 981 (La.1992). The insurer bears the burden of proving the applicability of the intentional injury exclusion. Yount, supra.
Watson's guilty plea was not a plea of nolo contendere under LSA-C.Cr.P. art. 556.1, but was instead, a guilty plea to a lesser and included offense under LSA-C.Cr.P. art. 558. It is thus competent evidence in this civil context. LSA-C.E. art. 410(A)(2); Shephard v. Scheeler, et al., 96-1690 (La.10/21/97), 701 So.2d 1308. In the course of the guilty plea, Watson admitted to manslaughter and, in this context, he admitted to having the specific intent to kill or to inflict great bodily harm *571 upon the victim. Although we do not believe that such a plea is conclusive of the issue, in his deposition, Watson admitted that "I was directly aiming at him ..." and expressed surprise only that he "hit him so many times." Watson must have had a subjective belief that West's death or grievous injury that could produce death was substantially certain to follow from the shooting. Watson aimed and fired several shots at West. With his admission that he was aiming at West while he was shooting at him, Watson's deposition testimony fails "to produce factual support sufficient to establish that plaintiffs will be able to satisfy their evidentiary burden of proof at trial," LSA-C.C.P. art. 966(C)(2), despite Watson's protestations that he did not intend to kill West. Further, we observe that Watson could have no justifiable belief that any insurance policy would cover his criminal actions; indeed, Watson left his car to shoot and kill West. We further agree that the shooting could not be an "occurrence" as defined in the policy, the shooting was clearly not an accident.

CONCLUSION
For the foregoing reasons, the trial court's summary judgment in favor of the defendant, Certain Interested Underwriters at Lloyd's, London, is affirmed. Costs of this appeal are assessed to the appellants.
AFFIRMED.
NOTES
[1] In their petition, the plaintiffs are listed as follows: Frances Turner West, on behalf of her minor son, Lamareo J. West and Sherry Lambert West, on behalf of her minor children, Jamarea Lambert West and Beau Lambert West.