SAUNDERS, Judge.
11 This is a medical malpractice case wherein the medial review panel and the trial court found no breach of the standard of care by an orthopedic surgeon who attempted to repair a right low intertrochan-teric fracture on one of the plaintiffs. The surgery was unsuccessful and resulted in a non-union of the fracture, a known complication with this type of surgery.
*573 The plaintiffs, due to only documentary evidence being submitted for the trial court to evaluate, contend that a de novo standard of review is applicable to this matter. We find no basis for this assertion and also find sufficient evidence in the record to support the trial court’s judgment.

FACTS AND PROCEDURAL HISTORY:

On April 3, 2007, Auta Highsmith (Mr. Highsmith) fell in his yard and fractured his right upper femur/hip. He was transported to Lake Charles Memorial Hospital for evaluation. A diagnosis of hip fracture was made at that time. There was no orthopedic surgeon on call at Lake Charles Memorial, so Mr. Highsmith was transported to Christus St. Patrick Hospital in Lake Charles. There, after appropriate pre-operative confirmation of the original diagnosis, on April 5, 2007, Dr. Lynn E. Foret (Dr. Foret) performed the surgical repair of Mr. Highsmith’s fracture with an open reduction and internal fixation with a trochanteric fixation nail. Dr. Foret described the procedure as uneventful, and the post-operative radiographic studies that were conducted indicted proper alignment.
On April 12, 2007, Mr. Highsmith was discharged from the surgery floor and admitted to the rehabilitation unit on the same campus. Dr. Foret prescribed physical therapy for Mr. Highsmith to include weight bearing as tolerated. Thereafter, on April 14, 2007, Dr. Foret was re-consulted wherein he 12acknowledged that there was motion in the distal femur. He planned to use a L’Nard boot due to the amount of rotation.
According to Mr. Highsmith, he continued to have complications from the surgery such as pain and motion at the fracture site. Following his discharge from the rehabilitation unit, Mr. Highsmith was seen by Dr. Foret several times in May and June of 2007.
Mr. Highsmith relocated to Nevada in the summer of 2007. There, on August 14, 2007, he saw Dr. Michael Ravitch, an orthopedic surgeon. Dr. Ravitch noted that Mr. Highsmith had pain and a limp along with leg numbness, stiffness, and weakness. Radiographic studies done then indicated a non-union of the fracture.
Dr. Ravitch referred Mr. Highsmith to Dr. Roger Fontes, another orthopedic surgeon who specialized in fracture and nonunion care. Dr. Fontes described the fracture as a mal-oriented proximal fracture for which he attempted a surgical intervention known as an osteotomy. This procedure failed to stabilize the fracture site. Dr. Fontes suggested a different, more complex surgery, but Mr. Highsmith’s cardiologist concluded that he was not sufficiently stable from a cardiovascular standpoint to undergo the surgery. Therefore, Mr. Highsmith has a permanent non-union of the fracture site.
Mr. Highsmith and his wife, Eunice Hi-ghsmith (the Highsmiths) timely submitted their claims against Dr. Foret to a medical review panel. The panel issued an opinion dated February 22, 2010, finding that Dr. Foret had not breached the standard of care in his treatment of Mr. Highsmith. Thereafter, on May 21, 2010, the Hi-ghsmiths filed a petition for damages against Dr. Foret.
On April 17, 2012, a bench trial was held on the merits. Both parties agreed to submit evidence to the trial court through documentary evidence alone, without Rany live testimony being taken. The trial court, after taking the case under advisement, found that the Highsmiths failed to prove by a preponderance of the evidence that Dr. Foret breached the applicable standard of care. Judgment was rendered in Dr. Foret’s favor dismissing the Hi- *574 ghsmiths’ claims. The Highsmiths appeal this judgment raising four specifications of error.

SPECIFICATIONS OF ERROR:

I. The Trial Court erroneously failed to even consider the expert testimony of Dr. Roger Fontes, the only treating physician to provide expert testimony in this matter.
II. The Trial Court failed to take into consideration the testimony of Dr. Gordon Mead, a member of the medical review panel, who provided deposition testimony confirming that the medical review panel failed to address certain critically important issues and concluded that Dr. Foret deviated from applicable medical standards resulting in the damage suffered by Mr. Highsmith.
III. The Trial Court erred in reaching three conclusions for which there was absolutely no evidentiary support from any medical expert:
A. Full weight bearing on an unstable fracture is the standard of care;
B. A lateral view of the fracture site post-operatively would not have caused the complication to “cease”; and,
C. Mr. Highsmith’s injuries would have occurred anyway because of his age.
IV. The Trial Court erroneously relied upon the medical review panel opinion even though the only panelist to testify, Dr. Gordon Mead, confirmed that the panel was incorrect because it failed to consider significant issues regarding Dr. Foret’s medical mismanagement.

DISCUSSION OF THE MERITS:

In each of their four specifications of error, the Highsmiths present arguments that all seek the same result, that this court reverse the trial court’s finding that they failed to prove, by a preponderance of the evidence, that Dr. |4Foret’s degree of care in treating Mr. Highsmith was substandard. Specifically, each specification of error is an argument that Dr. Foret’s care was substandard in either his failure to obtain a radiographic study with a lateral view of the reduction intraoperatively or in his instructions that Mr. Highsmith undergo weight bearing physical therapy. We will address each specification of error under this common heading, as the sole issue before us is whether the trial court was erroneous in its finding the Hi-ghsmiths’ failed to prove a breach of the applicable standard of care by Dr. Foret.

STANDARD OF REVIEW:

The Highsmiths contended both in brief and at oral arguments that the applicable standard of review is de novo in determining whether the trial court’s judgment was erroneous. They base this contention on the fact that all evidence submitted at trial was documentary, with no witness testifying live in the presence of the trial court. This court requested additional briefs specifically addressing this issue at oral arguments. After having reviewed the arguments made and said briefs, we find that the Highsmiths’ contention is without merit.
Our supreme court, in Virgil v. American Guarantee and Liability Insurance Co., 507 So.2d 825, 826 (La.1987) (quoting Canter v. Koehring Co., 288 So.2d 716, 724 (La.1973) (emphasis in Virgil)), stated:
The manifest error standard and its purpose were stated succinctly in Canter v. Koehring Co., 283 So.2d 716 (La.1973), as follows:
“When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a *575 reasonable factual basis for the trial court’s finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not | sbe disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this ivell-settled principle of review is based not only upon the trial court’s better capacity to evaluate live witnesses (as compared with the appellate court’s access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.” (emphasis supplied)
Louisiana’s three-tiered court system allocates the fact finding function to the trial courts. Because of that allocation of function (as well as the trial court’s normal procedure of evaluating live witnesses), great deference is accorded to the trial court’s factual findings, both express and implicit, and reasonable evaluations of credibility and reasonable 'inferences of fact should not be disturbed on appellate review of the trial court’s judgment.
Our supreme court reiterated its view of “the proper allocation of trial and appellate functions between the respective courts” in Shephard ex. rel Shephard v. Scheeler, 96-1690, 96-1720, pp. 14-15 (La.10/21/97), 701 So.2d 1308, 1316-17 (footnotes omitted) when it opined:
The manifest error standard of review is well established and recognized in our jurisprudence. The rigid and strenuous application of manifest error review has served the judicial process well. A lesser standard, albeit when a case is submitted to the trial court solely upon a written record, unduly undermines the allocation of the fact finding function to the trial courts.
We recognize that a good and persuasive argument can be made to lessen the standard of review when evaluations and findings of fact are not based upon demeanor evidence. A review of the jurisprudence of our sister states who have addressed this issue reveals that the majority of states have held that great deference need pot be extended to the trial court when its findings of fact are based on depositions, affidavits, and other documentary evidence. Nevertheless, a minority of states adhere to the rule that even when. considering documentary evidence, an appellate court must find clear error to overrule the trial court’s findings of fact.
After carefully studying this issue, we find that the proper allocation of trial and appellate functions between the respective courts are better served by the heightened standard of manifest error review. Therefore we use this occasion to reaffirm our pronouncement in Virgil.
Rlt is clear that our supreme court has instructed that we are to apply the manifest error standard of review to factual findings made by the trial court, regardless of the absence of live testimony, in order to perform our proper function in Louisiana’s established court system. While the Highsmiths cited cases that were contrary to our supreme court’s mandate, those cases were either: (1) from a circuit different than this one (and based on cases that occurred prior to the clear instructions from our superior court) and, thus, not controlling; or (2) cases that occurred prior to our supreme court’s holding in Virgil, and, therefore, no longer *576 good law. Accordingly, we will apply the manifest error standard of review where appropriate in this matter despite the lack of live testimony presented to the trial court.

BURDEN OF PROOF:

Louisiana Revised Statutes 9:2794 establishes that a plaintiff in a medical malpractice action has the burden to prove, by a preponderance of the evidence, the following:
(1) The- degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
17Given the applicable statute, the Hi-ghsmiths had the burden to establish the standard of care required of Dr. Foret, to prove that Dr. Foret failed to meet that established standard of care, and to prove that the injuries suffered by the Hi-ghsmiths was causally connected to Dr. Foret’s failure to meet the established standard of care. The trial court found that the Highsmiths did not prove by a preponderance of the evidence that Dr. Foret’s degree of care was substandard. Therefore, we must determine whether the record contains a reasonable basis for the trial court to reach this conclusion.
The following evidence was submitted to the trial court: Mr. Highsmith’s medical records, including radiographic imaging, and medical bills; the deposition testimony of Dr. Gordon Mead (an orthopedist and member of the medical review panel); the narrative report of Dr. Roger Fontes (an orthopedist that treated Mr. Highsmith months after the surgery performed by Dr. Foret); the narrative report of Dr. William Overdyke (an orthopedist who performed a review of Mr. Highsmith’s records and was an expert hired by the Highsmiths); and the opinion of the medical review panel.

LATERAL X-RAY:

The Trial court found that the Hi-ghsmiths failed to prove a breach of the standard of care by Dr. Foret based on the findings of the medical review panel. The medical review panel opinion stated:
The evidence supports the conclusion that the defendant, Dr. Lynn E. Foret, did adhere to the appropriate standard of care as detailed herein, and the damages complained of by [the Highsmiths] were not caused by the negligent [sic] or failure to adhere to appropriate standards of care by [Dr. Foret],
The opinion of the medical review panel went on to address the use of a distal screw to lock intramedullary devices in place. Dr. Foret elected not to use a distal screw in Mr. Highsmith’s surgery, In the opinion, the panel asserted that | sthere is no consensus that the failure to *577 lock intramedullary devices is below the standard of care.
Next, the medical review panel found that Dr. Foret’s post-operative follow-up was appropriately done with serial radio-graphic studies, and there was discussion about the necessity of re-operation because of non-union. Finally, the panel asserted that non-union is a known complication of this surgery and that it was not caused by the neglect or failure to adhere to the appropriate standard of care by Dr. Foret.
The Highsmiths contend that the trial court gave far too much credence to the medical review panel’s opinion. They contend that the trial court failed to take into consideration the testimony of Dr. Mead which undermined the value of the medical review panel’s opinion.
The Highsmiths pointed to portions of Dr. Mead’s testimony in an attempt to bolster their contention that the medical review panel failed to address certain critically important issues. They point to Dr. Mead’s testimony wherein he stated that he would always obtain and look at radio-graphic studies of the fractured segments, laterally, to ensure proper alignment in-traoperatively and that failure to do so is beneath the standard of care.
In reviewing Dr. Mead’s testimony, we do find that Dr. Mead testified to such and further stated that there is no evidence that Dr. Foret actually obtained these lateral views. Unfortunately for the Hi-ghsmiths, there is also no evidence that Dr. Foret failed to order and observe such lateral radiographic studies during the surgery and that he merely failed to make those studies part of the permanent medical records. There is evidence in the record that this does occur at times in surgeries such as Mr. Highsmith’s in the form of the following testimony of Dr. Mead:
IflA I would always get an AP and lateral view in the operating room, okay? I would like to tell you I probably do 98 percent of the time, but there are times when whatever happens and I don’t get that documentation and then I don’t get it in the recovery room. Or I think I did it — I thought the technician got those permanents and it turns out they didn’t.”
Q In other words, they took the shot but' they didn’t make a permanent picture.
A I saw it, but there was not a permanent evidence of that.
It was the Highsmiths’ burden to prove that Dr. Foret neglected to view these radiographic studies, and there is no evidence in the record that Dr. Foret was ever asked whether he viewed any lateral radiographic studies during the surgery. We cannot say that the lack of any lateral radiographic studies performed intraoper-atively in the medical records necessitates a finding that Dr. Foret failed to do so.
Insofar as the Highsmiths contend that Dr. Mead’s view was different than his view expressed as a member of the medical review panel, we find no evidence that this is accurate. Dr. Mead stated in his written opinion, the following:
[I]t is impossible to tell whether the fracture was actually poorly reduced and fixed by Dr. Foret or whether the fracture had simply became more angulated over a period of time.... I, therefore, find insufficient evidence to make an opinion regarding Dr. Foret’s handling of this case.
This statement by Dr. Mead is important as it is directly conflicts with the narrative report of Dr. Fontes that is relied upon by the Highsmiths. The Hi-ghsmiths point out that according to Dr. Fontes, the lack of an adequate reduction or the lack of maintaining the reduction during the instrumentation portion of the *578 surgery resulted in mal position of Mr. Highsmith’s fracture which was the major factor that contributed to his failed union.
Dr. Fontes’ statement that the lack of reduction contributed to the non-union may be accurate. However, as pointed out by Dr. Mead, it is not possible to [ 1ftdetermine with a reasonable degree of medical certainty whether Mr. Highsmith’s lack of reduction was due to substandard treatment by Dr. Foret or due to another factor, time.
The Highsmiths argue that Dr.’ Fontes’ opinion should be afforded greater weight, as he is a treating physician. However, Mr. Highsmith did not see Dr. Fontes until approximately four months after his surgery, and this amount of time, according to Dr. Mead, is enough for such an improper reduction to occur. Further, the radiographic studies that were done post-operatively indicated no such improper reduction, although no lateral radiographic study is indicated to have transpired. Accordingly, Dr. Fontes’ status as a “treating physician” in order for his testimony to be given greater weight has minimal relevance. Given that the Highsmiths have the burden to prove that this lack of reduction was caused by Dr. Foret’s inadequate surgery, one cannot say that a finding that they failed to carry this burden is unreasonable. As such, we uphold the trial court’s finding that the Highsmiths failed to prove that Dr. Foret’s failed to obtain and view a lateral radiographic study of Mr. Highsmith’s fracture intraoperatively to ensure proper reduction.
We note that Dr. Mead did testify that were he in Dr. Foret’s position in this litigation, he would have included some evidence, at least testimonially, that he intraoperatively observed a lateral radio-graphic study of Mr. Highsmith’s fracture. Dr. Foret’s submission did not include any such indication. While this court has sympathy for the Highsmiths on this issue, we are bound by our supreme court’s directive to give deference to the trial court’s reasonable finding of fact coupled with the burden of proof placed upon the Hi-ghsmiths.

U,PHYSICAL THERAPY:

The Highsmiths also argue that Dr. Foret’s inclusion of full weight bearing in his prescribed physical therapy was a breach of the standard of care, and the trial court’s failure to make this finding was in error. We disagree.
Our review of Mr. Highsmith’s medical records indicates that Dr. Foret ordered full weight bearing as tolerated. This is not a command by Dr. Foret that the therapist is to force Mr. Highsmith to endure full weight bearing no matter the circumstances. Thus, the Highsmiths contention that Dr. Foret ordered full weight bearing, and leaving off the key phrase, “as tolerated,” is quite significant.
When discussing the issue of ordering full weight bearing, as tolerated, in Dr. Mead’s deposition, the following exchange transpired:
Q: One of the biggest issues that has come up is the case concerns instructions concerning weight bearing. Did the panel review this issue?
A: Yes.
Q: And what is the general feeling on this patient — an eighty-one year old patent with the nature and extent of the injury that he had, with the surgery that he had, the hardware he had, concerning that portion of rehabilitation?
A: Okay. As far as I’m concerned, an eighty-one year old person is not going to be non-weight bearing on the broken hip. Okay? You have to rely on the fixation. They would *579 have to stay in bed for six months or three months or whatever. If they’re going to get out of bed, they’re going to do some weight bearing on that leg. If they’re going to sit up, they actually — there are forces across that hip. So you can’t get away from stressing it. So my — I almost universally allow patients to weight bear as tolerated. That’s not entirely — that’s not a hundred percent. There are cases where I feel that there’s too much risk, and if the patient can’t mentally cooperate sufficiently, I’m going to keep them as minimally weight bearing as possible because I’m just worried that my fixation is not going to hold well enough.
While the Highsmiths submitted the contrary opinion of Dr. Overdyke wherein he disagreed with Dr. Mead, our function is not to replace the choice of 112the trial court to give credence to one expert over another. Rather, we are to ensure that the choice of the trial court is reasonable. Here, Dr. Mead’s testimony provides a reasonable basis for the trial court to find that full weight bearing as tolerated is the instruction generally given by orthopedists to therapists treating patients such as Mr. Highsmith. Therefore, we cannot say that the trial court was manifestly erroneous in finding that the Highsmiths failed to prove that Dr. Foret breached the standard of care in his prescribing full weight bearing as tolerated for postsurgical physical therapy.

OTHER ARGUMENTS RAISED BY THE HIGHSMITHS:

In brief, the Highsmiths make various arguments regarding statements made by the trial court in its reasons for judgment that they characterize as erroneous and entitling them to a reversal of the trial court’s judgment. It is well settled that reasons for judgment are not appealable, as an appeal is to address the written, final, appealable judgment. McFadden v. Import One, Inc., 10-952 (La.App. 3 Cir. 2/9/11), 56 So.3d 1212; LaRocca v. Bailey, 01-618 (La.App. 3 Cir. 11/7/01), 799 So.2d 1263; La.Code Civ.P. art.1918. Here, the trial court’s judgment was that the Hi-ghsmiths failed to prove that Dr. Foret breached the standard of care. Above, we observe adequate support in the record for the judgment reached by the trial court. As such, we will not address these arguments.

CONCLUSION:

Auta and Eunice Highsmith appeal the trial court’s judgment that they failed to prove that Dr. Lynn Foret’s care of Auta Highsmith was beneath the standard of care. They raise four specifications for error questioning two findings of fact by the trial court.
11sWe find a reasonable basis exists in the record for the trial court’s findings. Accordingly, we uphold its judgment. We assess all costs of these proceedings to Auta and Eunice Highsmith.
AFFIRMED.