CONERY, J.,
dissents and assigns written reasons.
|¶1 respectfully dissent. I would reverse the judgment of the trial court, enter judgment for the plaintiffs, and remand for a trial on damages.

Standard of Review

In Virgil v. American Guarantee and Liability Insurance Co., 507 So.2d 825 (La.1987), and Shephard v. Scheeler, 96-1690 (La.10/21/97), 701 So.2d 1308, our supreme court has held that even when a case is submitted to the trial judge for decision on record evidence only with no live testimony, we are nonetheless obligat *580 ed to apply the manifest error standard when reviewing the case on appeal. When reviewing a summary judgment, likewise submitted on only record evidence with no live testimony, we are to use the less restrictive de novo standard. Smith v. Our Lady of the Lake Hosp., Inc., 93-2512 (La.7/5/94), 639 So.2d 730; Smitko v. Gulf South Shrimp, Inc., 11-2566 (La.7/2/12), 94 So.3d 750.
How do we reconcile the cases using the manifest error standard of review when reviewing cases submitted for trial on documents, affidavits, and depositions with those cases using the de novo standard when considering summary judgments using the same type of evidence? This seeming inconsistency can be explained by ^examining the rationale behind the rulings. A trial on the merits requires the trial judge to find the facts. The proper allocation of trial and appellate court functions requires deference to the fact finder. Summary judgments, on the other hand, can only be granted in cases where the material facts are not in dispute, hence no factual findings and no deference is required.
The larger question under the manifest error standard is how to decide whether the trial court was clearly wrong, how to apply the proper allocation of trial and appellate court functions. In Virgil and Shephard, our supreme court emphasized that even though a trial judge may have decided a case on a “cold record,” without live testimony that would allow the fact finder to observe demeanor, inflection, tone, and manner of testifying witnesses, appellate courts should none the less accord great deference to “the trial court’s factual findings, both express and implicit, and reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on appellate review of the trial court’s judgment.” Shephard, 701 So.2d at 1316. Immediately after this pronouncement of the standard of review in Shephard, the supreme court went on to find that the trial court in that case “clearly erred in finding that the accident was caused by an unreasonably dangerous puddle of standing water[.]” Id. The court reversed a finding of fact made by the trial court that it found was “clearly erroneous” based on review of all evidence of record. Clearly, great deference does not mean total deference.
In Alexander v. Pellerin Marble & Granite, 93-1698, p. 1 (La.1/14/94), 630 So.2d 706, 710, the supreme court re-affirmed Virgil and Shephard’s holding that the manifest error standard applied, even when documentary evidence is used, but then reversed a portion of the judgment of the hearing officer and appellate |3court, stating:
We find that the court of appeal did not err by applying the manifest error standard of review. Application of the manifest error standard of review does not however, mandate the affirmance of a lower court decision with respect to findings of fact. When an appellate court finds manifest error, the factual findings of the trier of fact may be reversed.
See also Magbee v. Federal Exp., 12-77 (La.App. 3 Cir. 12/12/12), 105 So.3d 1048, and Racca v. Acme Truck Lines, Inc., 12-1319 (La.App. 3 Cir. 6/12/13), 115 So.3d 1222 (both applying the manifest error standard, but finding that the workers’ compensation judge was clearly erroneous). Great deference does have its limitations. The appellate court can and must review the facts in fulfilling its purpose, role, and function.

Analysis of the Evidence

We must now analyze the factual findings made by the trial judge in this case in *581 light of the jurisprudence. First of all, even though we must use the manifest error standard, we do not have to ascribe any weight to the trial court’s ruling concerning the credibility of witnesses based on the manner of their testifying, tone, demeanor, or any other like evaluation, since ah of the evidence in this case was submitted by affidavit, records, or depositions. Therefore, we need only evaluate the judge’s actual factual findings to determine whether those findings were “clearly wrong.” What are those findings and are they supported or contradicted by the record evidence in this case?
The trial court based its decision primarily on the findings of the medical review panel. That opinion was primarily directed at whether the failure to use a distal screw to lock a rod used to stabilize Mr. Highsmith’s femur fracture in place during surgery was a breach of the standard of care. Dr. Foret did not use a distal 1 ¿locking screw in this case. The medical review panel concluded that the use of a distal locking screw to help prevent movement at the fracture site when performing this type of surgery is the preferred practice but it was not a violation of the standard of care for Dr. Foret not to do so, in their opinion. No facts were put forth to support their conclusion, except to discuss in passing that not all orthopedic surgeons use a distal locking screw.
The real question at issue is whether proper alignment and adequate reduction of the fracture was achieved in this particular surgery. Movement is an indication of possible improper alignment of the bones and inadequate reduction. A distal locking screw was not used to hold the stabilizing rod in place in this case, which is all the more reason to make sure proper alignment and reduction was achieved to prevent movement and foster bone healing. To successfully accomplish this goal for a surgery of this type, the surgeon must use x-rays. The uncontradicted evidence from Dr. Mead, a member of the original medical review panel whose deposition and records were filed in evidence, was that both a frontal (AP) x-ray view and a side (lateral) x-ray view must be visualized during surgery. The standard of care requires that the surgeon must visualize proper alignment and reduction of the fracture by use of a lateral x-ray before closing. The record in this case is silent as to whether a lateral .view was taken and visualized by Dr. Foret during Mr. Highsmith’s surgery.
The majority relies heavily on the written report of Dr. Mead in concluding plaintiffs failed to prove that Dr. Foret violated the standard of care. The majority quotes from Dr. Mead’s report:
[I]t is impossible to tell whether the fracture was actually poorly reduced and fixed by Dr. Foret or whether the fracture had simply became more angulated over a period of time.... I, therefore, l.ffind insufficient evidence to make an opinion regarding Dr. Foret’s handling of this case.
Dr. Mead’s statement, however, fails to properly account for the uncontradicted evidence that the medical records are silent on the issue of whether Dr. Foret visualized a lateral view to insure proper alignment and reduction during surgery. He did not “listen to the sound of silence,” to quote from Simon and Garfunkel’s famous song. The trial judge and the majority were likewise “tone deaf’ to the “sound of silence ” in the record on this issue and would place on the plaintiffs the impossible burden of proving a negative.
Dr. Mead, however, did offer the following testimony that is especially pertinent to the issue:
*582 Q. So, since there is no evidence of a lateral view, would you agree that if Dr. Foret failed to visualize the fracture with a lateral view intraop-eratively and post operatively that would be below the standard of care?
A. Yes.
Dr. Mead’s testimony on this issue is completely uncontradicted and must be accepted as true.
Even though Dr. Mead clearly testified that failure to visualize a lateral x-ray of the fracture during surgery was a violation of the standard of care and there was no evidence that a lateral x-ray was ordered or visualized by Dr. Foret during surgery, he then went on to testify that no evidence means that evidence was lacking as to whether Dr. Foret did or did not visualize a lateral x-ray. He gave the example that sometimes surgeons view the fracture during surgery using a c-arm fluoroscopy or moving x-ray technique. If the surgeon saw proper alignment and reduction at the fracture site while he was operating, then the radiologist need not actually take and develop a standard lateral x-ray film. Dr. Mead did say, however, |nthat he and everyone he knew of did take a lateral x-ray. Basically, his testimony was to the effect that it is possible that Dr. Foret did visualize a lateral view on fluoroscopy. Dr. Mead could not tell from the medical, hospital, and surgical records whether Dr. Foret did so in this particular case, as Dr. Foret made no operative notes of a lateral view of alignment and reduction, nor did not note that he visualized a lateral view during fluoroscopy.
The majority concludes that the plaintiffs did not prove that Dr. Foret failed to look at a lateral view. Since some surgeons arguably do look at fluoroscopy during surgery and do not record that fact in the record, the majority concluded that plaintiffs failed to sustain their burden of proof that Dr. Foret did not look at a lateral view during surgery.
Dr. Mead testified, however, that all pertinent findings during surgery must be recorded in the medical record. The evidence is uncontradicted that in a case like this, a lateral view must be obtained in order to insure proper alignment and reduction of the femur fracture, a very pertinent finding as this is the standard of care. Since the medical record is silent as to whether Dr. Foret ordered a lateral view, or that the radiologist did take a lateral view, or that Dr. Foret did visualize the proper alignment and reduction on fluoros-copy before closing the surgery, a prima facie case has been proven that Dr. Foret violated the standard of care.
Dr. Foret did not testify at trial, and his records, as well as the hospital and surgery records, are completely silent on that issue. If anything, his failure to testify would ordinarily raise a presumption that his testimony would have been detrimental to him. Since both parties stipulated that only records would be used in this trial with no live testimony, such a legal presumption cannot be applied in this case. We must, therefore, “listen to the sound of silence.” No notation means no |7lateral Anew was taken or visualized.
The circumstantial evidence in this case is overwhelming. There is no question that Mr. Highsmith had a non-union. Movement at the fracture site was detected by the physical therapist shortly after surgery. Mr. Highsmith continued to complain of severe pain. Yet, Dr. Foret, ignoring the findings and recommendations of the therapist and the complaints of Mr. Highsmith, continued to order full weight bearing on a femur that had not been properly aligned for healing. Dr. Foret did not order a lateral x-ray even after he examined the patient and person *583 ally noted movement at the fracture site fourteen days post-surgery. . His records and therapy records are clear and uncon-tradicted. There was undeniable evidence, of movement and a failed surgery within days of the surgery, while Mr. Highsmith was still in the hospital and the hospital rehab facility.
The records of Dr. Ravitch and Dr. Fontes, Mr. Highsmith’s treating orthopedic surgeons who saw him several months post-surgery, attest that Dr. Foret’s surgical and post-surgical care fell below the standard of care. Lateral x-rays taken by them several months after the surgery and reviewed by each of them showed there was a severe angulation noted at the fracture site that could easily have been seen during or shortly after surgery using a lateral x-ray. These treating physicians further testified that Dr. Foret’s failure to use a lateral x-ray was malpractice and was the cause of Mr. Highsmith’s continuing pain and disability.
Drs. Ravitch and Fontes verified that had a lateral x-ray view been obtained at the time of the surgery, Dr. Foret would have been able to determine that he had set the fractured femur at a severe angle, which eventually caused the broken ends of the bone to rub against each other. The frontal (or AP) x-ray taken would not have shown this poor alignment. According to Mr. Highsmith’s treating 1 ^physicians, Dr. Fontes and Dr. Ravitch, and the plaintiffs’ expert, Dr. Overdyke, the non-union caused additional destruction to Mr. Hi-ghsmith’s bones, as well as soft tissue damages and severe pain. It is uncontra-dicted that the physical therapist stated in his record shortly after surgery that in his professional judgment, full weight bearing, as ordered by Dr. Foret, was inappropriate due to external rotation of the leg and obvious motion at the fracture site. Even after he personally found on physical exam that there was movement at the fracture site within fourteen days of surgery, Dr. Foret nevertheless continued to order full weight bearing and still did not perform a lateral .x-ray. Dr. Foret’s orders taken directly from the physical therapy records confirm that Dr. Foret ordered Mr. Hi-ghsmith to “push to full weight bearing as soon as possible,” not “weight bearing as tolerated.”
It was at this point that the therapist pulled Mr. Highsmith’s son aside and expressed his opinion that full weight bearing was harmful to Mr. Highsmith and that he should not walk. Mr. Highsmith’s daughter then moved her father to Nevada, where- Mr. Highsmith consulted Dr. Ravitch and Dr. Fontes.
Dr. Ravitch is a highly credentialed board certified orthopedic surgeon. He noted that in his examination about four months post-surgery that Mr. Highsmith continued to have severe and intractable pain, numbness, stiffness, and weakness in his right leg. Mr. Highsmith had a noticeable limp, and Dr. Ravitch noted that Mr. Highsmith’s right leg was one inch shorter and was tender at the fracture site. Lateral x-rays showed a severe and obvious abnormality and non-union.
Dr. Ravitch referred Mr. Highsmith to Dr. Fontes, his partner, an orthopedic surgeon who specialized in treating non-unions. After his evaluation, Dr. Fontes confirmed that Mr. Highsmith was indeed suffering ' from “a mal-reduction of the proximal femur which was 30 degrees flexed on the lateral view.” He stated that 19the misalignment can be easily seen and diagnosed by use of a lateral view x-ray. Dr. Fontes agreed with the opinion of Dr. Mead that failure to obtain a lateral view by Dr. Foret would be a violation of the standard of care. Dr. Fontes also agreed with Dr. Ravitch in his conclusion that Dr. Foret had violated the standard *584 of care by failing to visualize a lateral view of the fracture during surgery, and that Dr. Foret’s surgery and post-surgery care fell below the standard of care, resulting in the non-union, continuing pain, and the need for treatment. Dr. Fontes attempted further surgical intervention to try to place a distal locking screw in place to help prevent further motion, but due to the severe damage that had been caused by the non-union, the osteotomy procedure he performed was not successful.
According to Dr. Fontes, the only remaining option was a more complex “take down” surgery. Due to Mr. Highsmith’s poor health and advanced age of eighty-one years, he could not be cleared for the procedure from a cardiovascular standpoint. According to the medical records introduced, Mr. Highsmith continues to suffer severe pain from a permanent nonunion, has a permanent limp, and has a noticeable knot in his thigh.
The trial court ■ failed to consider Dr. Mead’s testimony on the critical issue of documenting x-ray findings in the record, and the necessity of visualizing a lateral view and recording that finding in the record. He also failed to consider the testimony of the treating physicians, Dr. Ravitch and, especially Dr. Fontes on this issue. It is well settled that the testimony of a treating physician is entitled to greater weight than that of an examining physician or an expert who reviews records only. Wilczewski v. Brookshire Grocery Store, 08-718 (La.App. 3 Cir. 1/28/09), 2 So.3d 1214; Johnson v. NATCO, 94-1286 (La.App. 3 Cir. 3/1/95), 651 So.2d 494.
|inHere, the trial judge relied on the opinion of the medical review panel, which addressed only the question of whether a distal locking screw should have been used to prevent movement, not whether a lateral x-ray should' have been taken to determine proper alignment and reduction.
Rather, the medical malpractice' in this case is best summarized in the report from Dr. William Overdyke, a board certified orthopedist, nationally recognized as a joint replacement specialist. Dr. Overdyke reviewed all of Mr. Highsmith’s records and x-rays and concluded that Dr. Foret clearly committed medical malpractice. He stated:
In my professional opinion, after reviewing the course of treatment and outcome, acceptable medical standard has been breached. Inappropriate use of the internal fixation and in addition, after admitting that there was gross motion at the fracture site, electing not to address the problem but to continually push the patient to weight bear on a fracture that should not be stressed. Again, to make it clear, I believe that the medical care was below an acceptable standard, and I believe that any panel review would agree with the side of the plaintiff.
Dr. Overdyke further opined that even after Dr. Foret became aware of a possible non-union and movement at the fracture site, his post-surgical care continued to be beneath the standard of care. He summarized the medical records in this case:
The summary of the treatment was that Mr. Highsmith sustained a femur fracture on April 3, 2007. He underwent internal fixation with a TFN internal fixation device placed by Dr. Lynn Foret on 4/5/07. Following the internal fixation, the patient remained in acute care for several days and he was discharged on 4/12 to rehab. On 4/14, it was noticed that there was motion at the fracture site. Even following this information, Dr. Foret continued to try to press to full weight bearing.
On 4/16, the right lower extremity was found to be externally rotated. He was placed in a brace to decrease stress motion. In orders obtained from the *585 chart dated 4/27, a physical therapist wrote in their notes (under St. Patrick page 452) that in their professional judgment, they didn’t think it was appropriate to push to full weight bearing. Orders taken verbally in the hospital on 4/24, 26, and 27, say push to full weight bearing as soon as possible. This is in the face of an x-ray that |nwas done on 4/24 that showed apparent complete loss of internal fixation and comminution at the fracture site. An additional note on 4/25, the physical therapist noted that the son was taken aside apparently in private conversation and was told it was not appropriate for the patient to ambulate in light of the x-ray on 4/24. I understand from your inquiry that the patient was moved to Nevada and the non-union was, hopefully, appropriately treated.
The trial judge was “clearly erroneous” and committed “manifest error” in failing to properly weigh and consider the evidence in this case. Shephard, 701 So.2d 1308; Alexander, 630 So.2d 706.

Conclusion

In summary, the overwhelming weight of the evidence clearly demonstrates that Dr. Foret’s surgery resulted in a nonunion at the fracture site, which he neglected to recognize based on his failure to order and review a lateral x-ray during and post-surgery. His post-surgical care, even after he became aware of the nonunion and movement at the fracture site, fell below the standard of care. His negligence was clearly the proximate cause of Mr. Highsmith’s continued injuries, damages, and disability.
In the interest of justice, this case must be reversed and judgment must be rendered in favor of the plaintiffs.

Damages

The record is sparse on the issue of damages. Mr. and Mrs. Highsmith did not testify. The parties stipulated to the amount of medical bills incurred due to the alleged malpractice. Other than the medical records and bills, there is no other evidence in the record from which this court could perform a de novo review and properly assess damages. I would remand this case to the trial court for proper consideration of the issue of damages consistent with this opinion.