GASKINS (Ad Hoc ), J.
Randy and Lori Vaughn (the "Vaughns") appeal a judgment finding them liable for damages sustained by Matthew Chaney when a vehicle driven by Chaney struck a black cow owned by the *1211 Vaughns on a stock-law highway in Richland Parish. We affirm.
FACTS
The Vaughns raise cattle on property in Richland Parish that is west of and adjacent to an approximately 1.25- to 1.5-mile stretch of Louisiana Highway 583 as it runs north from its intersection with Louisiana Highway 852. A pasture that is referred to as the Vaughns' "home pasture" is located along about 0.5 miles of this stretch. The portion of the home pasture facing the highway is enclosed by a two-strand electrical fence, with the remainder enclosed by a barbed wire fence.
Chaney was a volunteer fireman in Richland Parish. At 2:00 a.m. on January 5, 2012, he received a call over his radio about a fire. He was unable to use his own vehicle because it was blocked in at his parents' home where he was spending the night, so Chaney drove his parents' Chrysler Pacifica to the fire. The Pacifica was not equipped with a siren or flashing lights. As Chaney drove 75 mph south on Highway 583, the left front of the Pacifica struck a black cow that was in the highway approximately 0.3 miles north of Highway 852. The Pacifica landed in a ditch to the west of the highway, while the cow landed in a ditch on the opposite side of the highway.
Richland Parish Sheriff's Deputy Loyd Hamm was the first law enforcement officer to reach the accident scene. He recalled that upon arriving, he saw several other cows on the highway about 100-200 feet from the crash, and that these cows jumped to the west and into the Vaughns' pasture in response to his activated lights and siren.
Richland Parish Sheriff's Deputy Roger Achord also responded to the accident. Deputy Achord, who arrived after Deputy Hamm, did not see a cow at the scene other than the one struck by Chaney.
A sheriff's dispatcher called the Vaughns' home, which was located to the north of the home pasture, to inform them of the accident. Lori Vaughn and her son Travis Cowell drove the short distance to the site. The fence near the accident scene was a two-strand electrical fence, and Lori did not see the fence down near where the accident occurred. Travis recalled that after he arrived, he checked the fence with a pair of fencing pliers and found that the fence was still "hot." Travis added that he got a good spark on the fence, which he said he would not have gotten if the fence had been down in any location. Lori remembered seeing a spark from the fence that night. After checking the fence, Lori and Travis went to the ditch to look at the cow. Lori claimed that because the cow landed with her head underneath the body, she could tell only that it was a black cow.
Master Trooper Kenneth Baker from the Louisiana State Police took over the accident investigation when he arrived on the scene approximately 40 minutes after the accident. Trooper Baker recalled that Lori said the cow belonged to them when he asked her. When Lori requested to move the cow, he told them to wait until daybreak. Around sunrise that morning, the cow was dragged to a site on the Vaughns' property, where it remained unburied.
Lori claimed that as soon as she was able to inspect the cow, she knew it did not belong to them because not only did she not recognize it, but it also lacked an ear tag or any indication that it had ever had an ear tag. Lori's husband, Randy Vaughn, returned home on the weekend following the accident after being out of town because of his job. Randy maintained that he knew the black cow struck by Chaney's vehicle was not one of his cows when he examined it.
*1212 Trial
Chaney filed suit against Randy and Lori Vaughn on October 22, 2012. He alleged that they owned the cow in question and the accident was caused by their negligence in failing to: (i) keep a proper lookout, (ii) maintain control of their livestock, (iii) pay proper attention to fence conditions, and (iv) make proper repairs to their fences. The Vaughns filed an answer denying ownership of the cow.
The trial judge heard testimony from Chaney, Cowell, and the Vaughns. The depositions of Deputies Achord and Hamm, Trooper Baker, and Major Claude Mercer, who had worked as an investigator for Chaney's attorney, were admitted into evidence. Major Mercer testified as an expert in accident investigations.
Lori believed that she was called to the scene as the presumed owner of the cow. She maintained that when Trooper Baker asked who owned the cow, she responded that she guessed it could be her cow. Lori stated that although she told Trooper Baker that it could be her cow, at that time she had no way to positively identify it because it was in a water-filled ditch with its head underneath the body. Once the cow was dragged out of the ditch, she did not recognize the cow or see any tags or holes in its ears. Lori, who claimed that she was familiar with the cows and had named most of them, added that she would not have said it was their cow that night had she been able to see the cow's head. Travis testified that he was unable to tell whether or not it was his mother's cow when it was in the ditch because he could not see any identifying tags or markings.
Trooper Baker observed Lori and Travis walk down to the ditch to look at the cow. He did not recall them lifting the cow or trying to move its head. Deputy Hamm testified that he heard Lori tell Trooper Baker that it was their cow.
Trooper Baker looked down into the ditch for any identifying marks on the cow. He would have noted any tags or tattoos on the cow as his practice was to record this information. Photographs of the accident scene were taken by Trooper Baker. Neither deputy inspected the cow.
Randy explained that all of his cows had plastic ear tags that measured approximately two-thirds of a pencil in length, and one-half of a pencil in width. The tags were usually placed in the left ear. Randy further explained that if a tag was accidentally removed by a cow fighting or the tag getting caught on something, then it would have been either ripped across the ear or pulled through the ear making a hole as big as the tag itself. Neither Lori nor Travis found a tag or a hole or tear in the cow's ears when they examined it after the cow was removed from the ditch. Randy inspected the cow's ears upon returning home and did not see a tag or any tears or holes indicating that a tag had ever been placed in the cow's ear.
Lori stated she observed no holes in the cow's ears, which meant it never had an ear tag. She explained that once an ear is tagged, the hole remains in the cartilage, and if the tag is torn out, it leaves a slice since the cartilage will not heal because of low blood flow. She estimated that a tag would leave a hole in the ear about the size of an ink pen.
According to Travis, he specifically looked at the cow's head and ears after it was removed from the ditch to see if he could identify it, and he did not see a tag or a hole where a tag had been. In Travis's opinion, a tag had never been placed in the cow's ear because a tag leaves a permanent hole that is very visible.
Travis took photos of the cow after it was dragged out of the ditch, while Randy took photos of the cow's ear when he returned home. The photos, which were admitted *1213 into evidence, were taken to show the absence of an ear tag or any holes or tears in the cow's ears. Also admitted into evidence were photographs of a calf and another cow owned by the Vaughns. Lori had named the other cow "Grabber," and the Vaughns maintained that the bottom of a white ear tag could be seen at the top of one of the photos of Grabber.
The Vaughns also maintained that they had the same number of cattle before and after the accident. The cattle, not all of which were black, had been counted about a month prior to the accident when they were wormed, and the count showed 72 cows and 3 bulls in the home pasture. They counted the cattle again several weeks after the accident when they were moved to another pasture. The count remained 72 cows and 3 bulls, with no cows missing but a few calves added. Lori admitted keeping a ledger showing the number of cows, but she did not bring the ledger to trial.
Randy testified that other individuals own black cows in the immediate proximity of his property. He stated that black cows were located north of his property on the east side of Highway 583. He added that south of Highway 852, there were black cows in pastures on both sides of Highway 583. Randy admitted there were no black cows directly to the east of his property on the north side of 852, or next to the home pasture. Lori stated that her husband's testimony regarding the location of nearby black cows was accurate.
Deputy Achord did not see any other cows nearby while at the accident scene, and to his knowledge, the Vaughns' pasture was the closest one to the accident scene.
Major Claude Mercer, who had been with the Louisiana State Police for 34 years and had been in charge of criminal investigations, was working for the Richland Parish Sheriff's Office at the time of his deposition. Chaney met with Major Mercer at the accident scene on January 18, 2012. Major Mercer drove several miles north of the accident site and did not see any cows. When he drove south on Highway 583, he saw cows to his left as he passed the intersection with Highway 852, but none of the cows were black.
Randy acknowledged that an electrical fence will sometimes short out, and that Farm Bureau did not offer him coverage when he applied for it because Farm Bureau required that he have a three-strand electrical fence.
Lori and Travis noticed that the fence was still "hot" when they checked it after arriving at the accident. Deputy Hamm thought it was an electrical fence, but did not inspect it or determine if it was working at the time. Deputy Achord noticed that the electrical fence was up, and while he did not see any holes in it, he never checked the fence to see if it was "hot." Trooper Baker made no observations about the fence.
Lori and Travis checked the fence the next morning and did not see any indication that the fence was down. The fence remained "hot." Lori agreed at trial that it would not make a difference whether or not a fence is "hot" if a cow jumps it, but she added that generally a cow will not jump a fence unless something is pursuing it. Randy checked the fence when he returned home. He did not find any spots where it was down, and he determined that the fence was still working.
Major Mercer looked at the fence when he met with Chaney, and while he did not see any part of it down, he did not think it was in good condition. Major Mercer never touched the fence and believed it was a barbed wire fence.
Deputy Hamm testified that he observed cows in the road near the accident scene, *1214 and that these cows jumped into the Vaughns' pasture when they were startled by his patrol car's siren and flashing lights. Lori countered that Deputy Hamm told her that he saw no other cows out that night. Trooper Baker could not recall anyone telling him that there had been other cows out that night.
Deputy Hamm also remembered several prior instances when he either received a call that the Vaughns' cows were out or had driven up to find them out on the highway. Deputy Hamm added that usually the cows would just jump back into the pasture. Deputy Hamm also stated that he had gotten calls concerning cows not owned by the Vaughns being on the road, but not in that same area. Deputy Achord testified that his department had received numerous complaints of cows out in that area in the past. Randy admitted to receiving prior calls about cows being out, but maintained that in not every instance did the cows belong to him. One of Randy's cows had gotten out of the pasture before jumping back in a few days before he gave his deposition.
As part of his investigation, Major Mercer interviewed Trooper Baker and Deputy Achord. He spoke briefly with Deputy Hamm on the date of his deposition when Deputy Hamm brought up seeing the cows on the road after he mentioned to Deputy Hamm that he was going to give a deposition. Major Mercer, who testified as an expert in accident investigations, believed that it was more probable than not that the cow in question belonged to the Vaughns based on the proximity of the cow to their property, the fact he did not see any other black cows in the area, what Lori had told Trooper Baker about owning the cow, what dispatchers had told him about the Vaughns' cows being on the road on prior occasions, and what Deputy Hamm had mentioned to him.
The trial court rendered judgment in favor of Chaney, awarding general damages of $10,000, and special damages of $13,627.60 after accounting for 20% of fault that was assessed against Chaney. Even though Chaney was responding to an emergency, the court concluded that he was driving at an excessive speed considering the time of day, lack of visibility, and lack of emergency lights that could have scared the cow off the highway.
In her detailed reasons for judgment, the trial judge noted that the photos of Grabber and her calf did not show a tag in their ears. The trial judge also noted that not only was Lori the only person to corroborate Randy's testimony that there were other cow owners in close proximity to the accident scene, but there also were no photos of these purported cows. She contrasted this with what Major Mercer reported seeing when driving in the area, as well as Deputy Achord's testimony that he did not see other cows nearby and that the Vaughns' cows were the closest to the scene.
The trial judge noted that the case was a close call, but she could not ignore the testimony of the disinterested law enforcement officers. The court gave substantial importance to Deputy Hamm's testimony that other cows in the road jumped back into the Vaughns' pasture when he approached the accident scene. She also gave great weight to Lori's initial statement at the scene claiming ownership, noting that it took Trooper Baker nearly an hour to get to the accident scene. This lapse of time allowed Lori and Travis ample time to more closely examine the cow or have it repositioned if she had any doubt about who owned it. Finally, the trial judge noted that it was significant that the Vaughns did not produce photos of cows with ear tags or of other black cows in neighboring pastures.
*1215 After finding that it was more probable than not that the Vaughns owned the cow, the trial court then cited La. R.S. 3:3003 and La. C.C. art. 2321, and applied the doctrine of res ipsa loquitur to the facts. The trial court concluded that Chaney proved the defendants' negligence because he presented evidence sufficient to meet the three criteria necessary to invoke res ipsa loquitur . First, the cow would not have been on the highway if the Vaughns had adequately controlled their livestock with proper fencing. Second, subject to Chaney's comparative fault, neither Chaney nor anyone else was responsible for the accident. Third, the Vaughns owed Chaney a duty to control and contain the cow so it did not enter his path on the highway.
The Vaughns appealed the finding of liability.
DISCUSSION
Applicable law
La. R.S. 3:2803 provides that no person owning livestock shall knowingly, willfully, or negligently permit his livestock to go at large upon certain enumerated public highways of Louisiana.
In Hines v. Garrett , 2004-0806, p. 2 (La. 6/25/04), 876 So.2d 764, 766, fn. 1, the supreme court stated the following regarding collisions between livestock and vehicles on state roads:
The jurisprudence interpreting La. Rev. Stat. 3:2803 is well settled that when an automobile strikes a horse or cow on one of the enumerated "stock law" highways, the burden of proof rests upon the owner of the animal to exculpate himself from "even the slightest degree of negligence." Thus, the courts have recognized that a legal presumption of fault or negligence on the part of the animal's owner is created in such cases. To rebut that presumption, the defendant must not only show that he has taken all reasonable and prudent measures and precautions to enclose his livestock, but he must also explain the presence of the animal on the highway by showing when, where, and how the animal escaped from its enclosure, that is, his complete freedom from fault.
Citations omitted.
As this court discussed in Church v. Shrell , 43,972, pp. 4-5 (La. App. 2 Cir. 1/21/09), 8 So.3d 70, 73-4 :
To establish a prima facie case of liability under LSA-R.S. 3:2803, the plaintiff must establish (1) ownership of the cattle; (2) the highway was one enumerated by the statute; and (3) presence of the cattle upon the roadway. Once the prima facie case is established, the burden shifts to the livestock owner to exculpate himself. The owner may only do so by establishing that the harm or damages to the plaintiff was the result of an independent cause. An independent cause is defined as: (1) a fortuitous event; (2) the actions of a third party over which the owner has no control; or (3) the fault of the plaintiff. Cedotal v. Hopkins , 589 So.2d 20 (La. App. 1 Cir. 1991). However, in order to relieve a landowner of liability, the independent cause must be the sole cause of the plaintiff's damages. Olsen v. Shell Oil , 365 So.2d 1285 (La. 1978) ; Dotson v. Matthews , 480 So.2d 860 (La. App. 2 Cir. 1985).
Highway 583 is not one of the highways specifically enumerated in La. R.S. 3:2803. However, La. R.S. 3:3001 states that "each ward of every parish in the state shall have the right, by local option election, to prohibit livestock from roaming at large in each said ward on those public highways other than those provided for in R.S. 3:2803." Furthermore, La. R.S. 3:3003 contains similar language to La. R.S. 3:2803 in that it states:
*1216 No person owning livestock shall knowingly, willfully or negligently permit his livestock to go at large upon the public highways of any ward of any parish where livestock is presently prohibited from roaming at large or any ward of any parish that shall hereafter adopt a stock law as hereinafter provided for.
Thus, the principle found in La. R.S. 3:2803 is applicable to violations of local option stock laws adopted pursuant to La. R.S. 3:3001. See Buller v. American Nat. Property & Cas. Cos. , 2002-820 (La. App. 3 Cir. 2/5/03), 838 So.2d 67.
The trial court noted that Richland Parish adopted such a stock law in Richland Parish Rule 5-31. This rule, which is reproduced in Chaney's memorandum on liability and quantum that was filed into evidence, states:
It shall be unlawful for any livestock or animals known as cattle ... to roam, run or be at large ... upon highways, roads ... throughout the parish; and every person owning or having under his control any such livestock shall keep the same continuously confined under fence or confined in a safe enclosure.
Ownership of the cow
The Vaughns argue that the trial court erred in determining that they owned the cow. They contend that until the day of Mercer's deposition, Deputy Hamm had never told anyone that he had seen cows on the road when he arrived at the accident. They also contend that testimony from Deputy Achord that Lori told him the cow belonged to her was contradicted by Mercer's testimony that Deputy Achord had told him that he did not remember hearing Lori say this. The Vaughns also point out that Deputy Achord gave inaccurate testimony about the presence of Chaney's father at the scene and how Chaney was transported to the hospital.
The Vaughns try to discredit Mercer by pointing out that he never interviewed them or inspected the cow, and that he never obtained the names of their neighbors or interviewed them to see if they owned black cows. The Vaughns also contend there were omissions in Mercer's investigation, and note that Mercer thought the fence was barbed wire.
An appellate court may not set aside a trial court's or a jury's finding of fact in the absence of manifest error or unless it is clearly wrong. Rosell v. ESCO , 549 So.2d 840 (La. 1989). To reverse a fact finder's determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. Stobart v. State through Dept. of Transp. & Dev. , 617 So.2d 880 (La. 1993).
The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court; but, if the trial court's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell , supra .
After noting that part of the rationale behind the manifest error standard of review is the trial court's better capacity to evaluate live witnesses, the Vaughns point out that Major Mercer and the other law enforcement officers testified by deposition. Nevertheless, this does not impact our standard of review. The manifest error standard of review applies even when the evidence before a trial court that considered *1217 the merits consisted solely of records and depositions. See Shephard on behalf of Shepard v. Scheeler , 96-1690 (La. 10/21/97), 701 So.2d 1308 ; and Williams v. Jackson Parish Hosp. , 31,492 (La. App. 2 Cir. 1/13/99), 729 So.2d 620, writ denied , 99-0458 (La. 4/1/99), 742 So.2d 558.
The ownership of cattle involved in an accident may be proved by circumstantial evidence. State Farm Mutual Auto. Ins. Co. v. Thompson , 433 So.2d 376 (La. App. 3 Cir. 1983), writ denied , 441 So.2d 212 (La. 1983).
The trial judge's conclusion that the Vaughns owned the black cow in question is well supported by the record. The accident occurred near the home pasture where the Vaughns were keeping their cows at the time of the accident. Deputy Hamm testified that upon his arrival at the accident scene, he observed several cows on the highway jump into the Vaughns' pasture. Deputy Hamm had dealt with the Vaughns' cows being on the highway in the past. Lori told Trooper Baker that the cow belonged to her. While Lori attempted to minimize this statement by asserting that she realized it was not their cow once she was able to see its head, the trial court noted that if Lori had any doubts about ownership of the cow, then she had adequate time before Trooper Baker arrived to confirm whether or not it was their cow.
The Vaughns contended that all of their cows had ear tags. Although an ear tag was filed into evidence, there was no photograph introduced that fully showed one of their cows with an ear tag. One photo of a cow showed what was purported to be the bottom of a tag. The Vaughns also asserted that counts taken of their cows before and after the accident showed that they were not missing any cows, yet a ledger showing the counts was not produced at trial.
The Vaughns claimed that other nearby property owners also kept black cows. As noted by the trial judge, there were no independent witnesses to corroborate this, and the Vaughns failed to produce any photographs supporting this. Furthermore, Major Mercer did not see any black cows in nearby pastures when he drove south and north of the accident site.
Based on the foregoing, we cannot conclude that the trial judge was clearly wrong in finding that the evidence established that it was more probable than not that the Vaughns owned the cow struck by Chaney's vehicle.
Legal presumption of negligence
Once the Vaughns' ownership of the cow was established, a legal presumption of fault or negligence on their part was created. The Vaughns could rebut this presumption only by both showing they had taken all reasonable and prudent measures and precautions to enclose their cattle, and by explaining the presence of the cow on the highway by showing when, where, and how the cow had escaped. See Hines v. Garrett , supra ; Church v. Shrell , supra . The Vaughns argued that even if the cow belonged to them, the evidence showed that they were free from fault.
After the trial court determined that the Vaughns owned the cow, the court moved on to the issue of liability and began by citing La. R.S. 3:3003. The court also cited La. C.C. art. 2321 as well as jurisprudence for the position that the standard for owners of animals other than dogs is ordinary negligence instead of strict liability. The court then concluded that based on the last sentence of art. 2321, it could apply the doctrine of res ipsa loquitur in this matter. The court concluded that Chaney had proven the Vaughns were negligent based on this doctrine.
It was unnecessary for the trial court to apply the doctrine of res ipsa loquitur in this matter. Once it was established *1218 that the Vaughns had owned the cow, which Richland Parish Rule 5-31 prohibited from being at large on Highway 583, a legal presumption of their negligence had been created under La. R.S. 3:3003 and the jurisprudence interpreting La. R.S. 3:2803. Nevertheless, in her analysis, the trial court found that the Vaughns had not adequately controlled their livestock with proper fencing. The Vaughns' first burden in rebutting the presumption of negligence was to show they had taken all reasonable and prudent measures and precautions to enclose their livestock. The finding that they had not adequately controlled their livestock with proper fencing meant they did not meet their burden.
Randy admitted that Farm Bureau Insurance had turned him down for insurance coverage because his electric fence was a two-strand fence instead of a three-strand fence. Randy had testified at his deposition that it would have cost $100 per quarter mile to add an additional strand to the fence. Cleary the Vaughns had not taken all reasonable and prudent measures and precautions to enclose their livestock when the fence could have been upgraded at a cost that was minimal when compared to the danger presented to the motorists by a cow being on the highway.
The Vaughns gave extensive testimony about their practice of inspecting their fences. Randy walked the fences about once every three months, and he rode a four-wheeler about once a month to check whether the fence was still conducting electricity. Travis would usually accompany him. Lori would check the fence along Highway 583 each time she drove past it, which she did at least twice a day.
Although the Vaughns explained that a cow would be sold if it left the pasture twice, they clearly had a history of their cows entering nearby roads. Significantly, Deputy Hamm recalled several instances when he either received a call that the Vaughns' cows were out or had just driven up and found them out, and he added that usually the cows would just jump back into the pasture.
In order to rely on the doctrine of res ipsa loquitur , a plaintiff must satisfy three factors: (1) present evidence which indicates at least a probability that injury would not have occurred without negligence; (2) sufficiently exclude inference of his or her own responsibility or responsibility of others besides the defendant in causing the accident; and (3) establish that negligence falls within the scope of duty to the plaintiff. Honeycutt v. State Farm Fire & Cas. Co. , 39,301 (La. App. 2 Cir. 12/22/04), 890 So.2d 756, writ denied , 2005-0184 (La. 3/24/05), 896 So.2d 1046. A plaintiff need not completely eliminate all other possible causes or inferences. Id.
The trial court concluded that Chaney had established the Vaughns' negligence based on the doctrine of res ipsa loquitur in light of: (i) Randy's testimony that the fence can sometimes short out and that Farm Bureau decided not to insure him because of his two-strand fence; (ii) Deputy Hamm's testimony that the Sheriff's Office had received calls in the past about the Vaughns' cows being out, that he had also driven up on their cows being on the highway, and that the cows would almost always jump back into the pasture; (iii) Deputy Achord's testimony that the Sheriff's Office had received numerous complaints about cows being out in the area near the Vaughns' home; and (iv) Randy's testimony that a cow had escaped a few days before his January 2014 deposition by running through the fence onto the highway before jumping over the fence to return to the pasture.
Based upon our review of the record, we cannot conclude the finding of the Vaughns' liability was clearly wrong under either a La. R.S. 3:3003 presumption of *1219 negligence analysis or the res ipsa loquitur analysis utilized by the trial court.
CONCLUSION
At the Vaughns' costs, the judgment is AFFIRMED.